Glenn KUPER and Cliff Jones, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

Michael IOVENKO and H. Weston Clarke, Jr., Defendants–Appellees,

Quantum Chemical Corporation, et al., Defendants.

No. 94–3688.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 11, 1995.

Decided Oct. 4, 1995.

Russell A. Kelm (argued and briefed), Juan Jose Perez, Schwartz, Kelm, Warren & Ramirez, Columbus, OH, for plaintiffs-appellants.

David T. Croall (briefed), James R. Adams, Frost & Jacobs, Cincinnati, OH, for Quantum Chemical Corp.

Eric M. Nelson (argued), Whitman, Breed, Abbott & Morgan, New York City, for Michael Iovenko, H. Weston Clarke, Jr.

Before: WELLFORD, MILBURN, and SUHRHEINRICH, Circuit Judges.

MILBURN, Circuit Judge.

Plaintiffs Glenn Kuper, Cliff Jones, and the class they represent, appeal the judgment of the district court for defendants Michael Iovenko and H. Weston Clarke, Jr. in this action, brought under the Employee Retire-

ment Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, in which plaintiffs allege that defendants breached their fiduciary duties. On appeal, the issues are (1) whether plaintiffs stated a claim for breach of fiduciary duty under 29 U.S.C. § 1109 where the plaintiff class was only a subclass of the employee benefit plan's beneficiaries, (2) whether defendants breached their fiduciary duty to plaintiffs by failing to make an immediate distribution under the terms of the Plan of plaintiffs' Employee Stock Ownership Plan ("ESOP") shares following the sale of Quantum Chemical Corporation's Emery Division to Henkel Corporation, (3) whether the district court erred in finding that defendants did not breach their fiduciary duty to plaintiffs by failing to exercise their discretion to distribute plaintiffs' ESOP shares during the eighteen month period between the sale to Henkel and the date that plaintiffs' ESOP shares were transferred to Henkel, and (4) whether the district court erred in finding that defendants did not breach their fiduciary duty to plaintiffs by failing to diversify or liquidate the ESOP funds after the sale of the Emery Division. For the reasons that follow, we affirm.

## I.

### A.

Plaintiffs are former salaried employees of the Emery Division ("Emery") of Quantum Chemical Corporation ("Quantum") who participated in the Quantum Savings and Stock Ownership Plan ("the Plan"). The Plan consisted of two components: (1) a voluntary retirement plan qualified under § 401(k) of the Internal Revenue Code and (2) an Employee Stock Ownership Plan ("ESOP"), which consisted of Quantum's matching contributions of Quantum stock, based upon each employee's 401–K contribution level, and occasional ESOP bonuses authorized by Quantum's Board of Directors. Employees could not contribute their own funds to the ESOP. The Plan provided that the ESOP feature was "designed to invest primarily in qualified" Quantum securities. § 5.01(a), J.A. 581.

Eligible Quantum employees were offered an opportunity to participate in the ESOP pursuant to a prospectus dated February 8, 1988. Under the terms of the Plan, employees hired prior to April 1, 1988 were fully vested in their ESOP accounts, while employees hired on or after April 1, 1988 would become fully vested in their ESOP accounts after two years of service. Once vested, the ESOP funds were not forfeited upon an employee's termination of employment with Quantum, and the Plan required immediate distribution of an employee's ESOP funds upon the employee's termination. § 10.01(a), § 10.03(a); J.A. 595, 597. The Plan also granted its fiduciaries discretion to distribute an employee's ESOP account upon the sale by Quantum of substantially all of its assets or of one of its subsidiaries, provided that the employee continued employment with the buyer. § 10.01(b), J.A. 595.

The Plan provided that Quantum's Board of Directors was to appoint a benefits committee, made up of not less than three members, to administer the Plan. The Board of Directors appointed separate trustees for the ESOP component of the plan. Defendant H. Weston Clarke, Jr. was Quantum's Vice President of Human Resources and chairperson of the three-member committee that administered the Plan. Defendant Michael Iovenko served as one of three trustees of the ESOP from January 1988 to February 1990. Both the benefits committee and the ESOP trustees prepared minutes of their periodic meetings from April 1989 to November 1990 and from April 1989 to February 1990, respectively.

On December 27, 1988, as part of a recapitalization plan, Quantum's Board of Directors approved and announced a $50.00 per share special cash dividend that would be paid to each record shareholder as of January 7, 1989. In connection with the recapitalization, on March 11, 1989, Quantum entered into an Asset Sale Agreement to sell its Emery Division to Henkel Corporation ("Henkel"), effective April 17, 1989. At that time, Quantum and Henkel also negotiated an Employment Agreement in which Henkel agreed to continue to employ existing Emery employees under comparable terms and con-

ditions. The Employment Agreement provided that Henkel would accept from Quantum a trust-to-trust transfer of the Plan assets, including the 401(k) and ESOP funds, of those Quantum employees who continued employment with Henkel after the sale.

Although the sale of Emery to Henkel was effective on April 17, 1989, the trust-to-trust transfer of Plan assets was not completed until approximately eighteen months later. Plaintiffs claim that this delay was caused in part by Quantum's failure to obtain a determination letter from the Internal Revenue Service regarding the qualification of the Plan in a timely manner. Defendants assert that a number of unforeseen events delayed the trust-to-trust transfer, including Henkel's decision not to accept a transfer on behalf of the hourly employees. The trust-to-trust transfer finally occurred on September 20, 1990, when the Quantum stock in the ESOP was transferred to the Henkel Investment Plan. Henkel credited the Quantum ESOP accounts to individual Emery employee accounts on November 1, 1990.

From April 1989 through October 1990, the period during which the transfer was pending, the value of Quantum stock declined from a trading value of more than $50.00 per share to slightly more than $10.00 per share. Although the value of Quantum stock decreased substantially during this period, defendants point out that Quantum stock closed at or above the previous day's trading price on 181 of the 402 trading days during the period. In addition, there were some periods during which the stock price increased. Members of the Quantum benefits committee testified that they did not consider diversifying or liquidating the ESOP at any time during this period. However, they were aware of or had access to information about several events that occurred during the eighteen months following the sale of the Emery Division that were likely to impact the value of Quantum's stock. These events included: Quantum's recapitalization, which adversely affected Quantum's financial condition by increasing its debt burden, interest expense, and principal repayment; Quantum's decreased operational diversity; a major fire at one of Quantum's plants that hindered the company's production capacity; and a decline in Quantum's net sales and income.

### B.

Plaintiffs filed a purported class action complaint on December 27, 1991, alleging federal securities law fraud, ERISA violations, RICO claims, and common law claims. Plaintiffs named as defendants Quantum, certain Quantum directors and officers, and the fiduciaries of Quantum's employee benefits plans. On May 7, 1992, plaintiffs moved for certification of a class including all salaried employees of Quantum who participated in Quantum's stock ownership plan between December 28, 1988, and November 1, 1990.

On August 27, 1992, the district court granted judgment for defendants, on statute of limitations and other grounds, as to all claims set forth in plaintiffs' complaint except for plaintiffs' ERISA claims. Plaintiffs' ERISA claims were based upon the significant diminution in the value of plaintiffs' Quantum stock over the eighteen month period between the sale of Emery and the trust-to-trust transfer.

On November 3, 1992, the district court denied plaintiffs' motion for class certification due to a potential conflict of interest of designated class counsel. Plaintiffs subsequently filed a renewed motion for class certification, and on April 2, 1993, the district court certified plaintiffs' class consisting of all former salaried employees of Quantum's Emery Division between the dates of December 28, 1988, and November 1, 1990, who participated in Quantum's Savings and Stock Ownership Plan and/or Quantum's ESOP, and who continued their employment with Henkel after the sale.

Defendants filed a motion for summary judgment as to plaintiffs' remaining ERISA claims on February 17, 1993. On July 21, 1993, the district court held that plaintiffs had standing to pursue their ERISA claims. However, on October 27, 1993, the district court found that plaintiffs had failed to present sufficient evidence demonstrating that Quantum and its Board of Directors acted in a fiduciary capacity with respect to the ESOP funds and thus granted summary

judgment to those defendants. The district court also granted summary judgment to two defendants who were fiduciaries of the ESOP because plaintiffs failed to show cause why those defendants had not received service of process in a timely manner. The district court denied summary judgment, however, to defendants Clarke and Iovenko.

The remaining claims against Clarke and Iovenko were submitted to the district court for a decision based on the parties' trial briefs, reply briefs, proposed findings of fact and conclusions of law, and the stipulated record. On May 24, 1994, the district court entered judgment for defendants Clarke and Iovenko on plaintiffs' remaining ERISA claims. The district court held: (1) that the fiduciaries did not breach their fiduciary duty by failing to consider diversifying or liquidating the ESOP, because the circumstances during the relevant time period would not have compelled a "hypothetical prudent fiduciary" to conclude that retaining the stock was imprudent; and (2) that the defendants did not breach their fiduciary duty by failing to distribute the ESOP accounts during the period, because the trust-to-trust transfer was a corporate business decision and it foreclosed such distribution.

On June 20, 1994, plaintiffs filed a motion for reconsideration based upon this court's decision in *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368 (6th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994), wherein we reversed the district court and held that union employees of Quantum were terminated when the plant in which they worked was sold to Henkel, and thus the employees were entitled to an immediate distribution as of the closing date of the sale. However, plaintiffs filed a notice of appeal in this case with this court on June 23, 1994, thereby divesting the district court of jurisdiction to consider plaintiffs' motion for reconsideration. On July 19, 1994, plaintiffs filed with the district court a "Motion for Opinion on the Court's Potential Granting of Plaintiffs' Motion for Reconsideration."[1] On

July 28, 1994, the district court issued an order indicating that, although it probably would grant plaintiffs' motion for reconsideration, it would do so only for the limited purpose of clarifying certain portions of its prior order and not to reverse its prior decision. Plaintiffs subsequently pursued their appeal with this court and did not request that the case be remanded to the district court.

## II.

### A.

■ As a preliminary matter, we must address defendants' argument that the plaintiff class fails to state a claim for breach of fiduciary duty under 29 U.S.C. § 1109 because the class does not include all of the Plan's beneficiaries. Defendants claim that an action under 29 U.S.C. § 1109 must be brought on behalf of a plan as a whole and that a claim brought by a subclass of plan participants fails to satisfy this requirement. Plaintiffs respond that defendants misconstrue the meaning of "plan as a whole" and argue that § 1109 requires only that any relief inure to the benefit of the plan rather than to an individual.

■ Section 1109 governs the liability of a fiduciary who breaches "any of the responsibilities, obligations, or duties imposed upon fiduciaries" by ERISA. It mandates that the fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach...." 29 U.S.C. § 1109(a). ERISA's civil enforcement provision allows an action for relief under § 1109 to be brought by the Secretary, a participant, a beneficiary, or a fiduciary. 29 U.S.C. § 1132(a)(2). Although an individual may bring a § 1109 claim, this court has repeatedly held that ERISA does not permit recovery by an individual who claims a breach of fiduciary duty. Instead, § 1109 contemplates that breaches of fiduciary duty injure the plan, and, therefore, any recovery

---

1. In *First Nat'l Bank of Salem, Ohio v. Hirsch*, 535 F.2d 343 (6th Cir.1976) (per curiam), this court held that, if a party seeks to move to vacate the judgment of the district court after notice of appeal has been filed, he should file that motion with the district court. If the district court is disposed to grant the motion, it may enter an order that indicates this disposition. The party may then file a motion in the court of appeals to remand the case to district court.

under such a theory must go to the plan. *Adcox v. Teledyne Inc.*, 21 F.3d 1381 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 193, 130 L.Ed.2d 126 (1994); *Tregoning v. American Community Mut. Ins. Co.*, 12 F.3d 79 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994); *Bryant v. Int'l Fruit Prod. Co.*, 886 F.2d 132, 135 (6th Cir.1989) (per curiam). These cases distinguish between a plaintiff's attempt to recover on his own behalf and a plaintiff's attempt to have the fiduciary reimburse the plan.

We conclude that plaintiffs' position that a subclass of Plan participants may sue for a breach of fiduciary duty is correct. Defendants' argument that a breach must harm the entire plan to give rise to liability under § 1109 would insulate fiduciaries who breach their duty so long as the breach does not harm all of a plan's participants. Such a result clearly would contravene ERISA's imposition of a fiduciary duty that has been characterized as "the highest known to law." *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1468 (5th Cir.1986) (citing *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982)), *cert. denied,* 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987). Furthermore, the ruling that plaintiffs seek would benefit the Plan as a whole and would foreclose any subsequent litigation because it would cure any harm that the Plan suffered. Therefore, we conclude that plaintiffs as a subclass of Plan participants have stated a claim under 29 U.S.C. § 1109.

### B.

■ Plaintiffs argue that the district court erred in ruling that defendants did not breach their fiduciary duties to plaintiffs. Our review both of the district court's conclusions of law and of mixed questions of law and fact is de novo. *United States v. Spinelle,* 41 F.3d 1056, 1057–58 (6th Cir.1994); *Paul Revere Life Ins. Co. v. Brock,* 28 F.3d 551, 553 (6th Cir.1994). *See Waxman v. Luna,* 881 F.2d 237, 240 (6th Cir.1989) (per curiam) (holding that de novo review is proper where district court applied ERISA statutory law to facts of case to arrive at its conclusions).

■ Plaintiffs first argue that defendants failed to administer the Plan in accordance with its terms and thereby breached their fiduciary duty under 29 U.S.C. § 1104(a)(1)(D). They assert that the Plan provided that upon termination of employment they were entitled to an immediate distribution of their vested benefits. Plaintiffs maintain that such a termination occurred at the time of the sale of the Emery Division to Henkel, and, therefore, defendants are liable to plaintiffs for the difference in value of the ESOP stock at the time of the sale and the value of the stock as transferred. To support their contention that they were terminated at the time of the sale, plaintiffs cite our reversal of the district court in *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994). In *Wulf,* a parallel ERISA action brought by Quantum's former union employees, we held that the union employees were terminated from employment at the time of the sale of Emery to Henkel in April 1989 and were entitled under their Plan, which did not govern plaintiffs in this case, to an immediate distribution of their ESOP stock. Therefore, we held that their distribution in October 1989 should have been based on the stock's value at the time of the sale. In response, defendants argue that plaintiffs abandoned this termination claim in the district court and are therefore barred from raising it on appeal. In addition, they claim that, even if plaintiffs preserved this argument for appeal, *Wulf* should not control our decision. We address these arguments in turn.

Defendants assert that, after initially including the termination claim in their complaint, plaintiffs abandoned the claim. Defendants argue that plaintiffs failed to address the issue when it was raised by defendants in their motion for summary judgment and again abandoned the issue by failing to file a motion to remand after the district court indicated that it would grant plaintiffs' motion for reconsideration. Plaintiffs respond that the argument was raised before

the district court, and the district court had the opportunity to rule on it. Plaintiffs further argue that even if we find that the termination claim was raised in the district court only indirectly, we may consider the issue under one of several exceptions to the general rule that an appellate court should not pass on issues not raised at the trial level.

Although the district court did not rule on the termination issue, we find that it was raised below in a manner sufficient to preserve the issue for appeal. Defendants initially acknowledged plaintiffs' termination argument in their memorandum in support of their motion for summary judgment, by stating:

> [P]laintiffs allege that, under the terms of Quantum's employee benefit plan, employees were entitled to receive a distribution of vested assets upon "termination" of employment and that plaintiffs' employment "terminated" when the Emery Division was sold to Henkel.

J.A. 140. At the time this case was before the district court, this court had not decided *Wulf,* and plaintiffs had only the Southern District of Ohio's ruling that a termination had not occurred when the division was sold. Plaintiffs explain that they therefore did not make this claim their leading argument, although they continued to argue that defendants should have distributed the ESOP funds.

Furthermore, plaintiffs raised the termination argument after our reversal in *Wulf* in a motion for reconsideration, filed in the district court before they filed their notice of appeal to this court. The district court indicated, however, that while it would likely grant the motion for reconsideration, it was not inclined to reverse its prior decision. It stated:

> [T]he probability is that the Court *would* grant Plaintiffs' motion for reconsideration for the limited purpose of clarifying certain portions of the prior order at issue therein, and *not* to reverse the prior decision or to grant other relief requested in Plaintiffs' motion for reconsideration.

J.A. 395. In light of this language, it is not unreasonable that plaintiffs did not further pursue a motion for remand.

Additionally, even if the issue was raised only indirectly before the district court, we have the discretion to consider such issues. *See In re Allied Supermarkets, Inc.,* 951 F.2d 718, 725 (6th Cir.1991) ("Although as a general rule federal appellate courts do not consider issues not passed on below, deviations are permitted in exceptional circumstances."). In *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court stated that the decision to deviate from the general rule that a federal appellate court should not consider an issue not passed on below is a matter "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Id.* at 121, 96 S.Ct. at 2877. We have previously held that to the extent an issue not raised before the trial court "is presented with sufficient clarity and completeness and its resolution will materially advance the progress of already protracted litigation, we should address it." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1461 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). In addition to our determination that plaintiffs did not abandon this issue in the district court, we conclude that the issue was presented clearly to this court and that its resolution would materially advance this litigation, and we therefore will address the issue on appeal.

In order to decide whether defendants breached their fiduciary duty to plaintiffs by failing to administer the Plan according to its terms, we first examine the language of the Plan. It provides in relevant part:

10.01 Eligibility

(a) Upon a Member's termination of employment the Vested Portion of his Accounts, as determined under Article 7, *shall be distributed* as provided in this Article.

(b) In the event of the termination of the Plan without establishment of a successor plan, or in the event of the sale by an Employer of substantially all of its assets or the sale of a subsidiary of an

Employer, provided that in the case of such a sale the Member continues employment with the buyer, the entire amount to the credit of the Member's Accounts *may be distributed, in the Committee's discretion,* to the Member as provided in this Article.

J.A. 595 (emphasis added). Plaintiffs argue that they experienced a termination of employment within the meaning of section 10.01(a), thereby mandating distribution under the Plan. They claim that defendants' failure to make such a distribution was a breach of defendants' fiduciary duty. Plaintiffs base their argument regarding the meaning of "termination of employment" on our holding in *Wulf.*

At issue in *Wulf* was the proper valuation date for a distribution to Quantum's former union employees made subsequent to the sale of Emery to Henkel. The agreement under which Emery was sold to Henkel required Henkel to offer employment to former employees of the Emery Division and called for Henkel to cause either new or existing trusts to accept transfers of assets and liabilities from all of Quantum's retirement plans. After the sale, however, Henkel refused to effect a trust-to-trust transfer with the *Wulf* plaintiffs' plan. In response to Henkel's refusal to accept the transfer, Quantum amended the union employees' plan in October 1989, retroactively effective April 15, 1989, to provide for distribution of plan proceeds to plan participants in the event that Quantum sold substantially all of its assets or one of its subsidiaries and the plan participants continued employment with the purchaser. Subsequently, the *Wulf* plaintiffs filed a claim "to recover benefits due [them] under the terms of [their] plan," 29 U.S.C. § 1132(a)(1)(B), arguing that they were entitled to the value of their accounts as of April 1989, rather than October 31, 1989, the date that their accounts were distributed.

In *Wulf,* we determined that the language of the plan was ambiguous regarding whether a termination of employment had occurred on the date of sale, and we resolved this ambiguity by examining extrinsic evidence to ascertain the intent of the contracting parties. We focused especially on two documents distributed to the Plan participants by Quantum: a letter to all Quantum employees and a "Profit Sharing Stock Bonus Plan" newsletter. Both of these documents informed the employees that their ESOP accounts would be distributed to them when they "left Quantum." In addition, we noted that the *Wulf* plaintiffs repeatedly stated that they believed that they had "left Quantum" when they began to work for Henkel and were therefore entitled to their distributions. We determined that the change in the *Wulf* plaintiffs' status following the sale to Henkel constituted a termination of employment and that the amendment, which was back-dated to be effective two days before the sale, could not diminish the value of the vested accounts.

For the reasons detailed below, however, we hold that *Wulf* is clearly distinguishable and does not apply in this case to require a finding that plaintiffs were terminated from employment. First, we relied in *Wulf* on evidence to interpret ambiguous plan language that plaintiffs have not presented here. In *Wulf,* there were two documents before us that described what would happen when the plaintiffs "left Quantum," but only one of those documents is in this record. Furthermore, the plaintiffs in *Wulf* testified that they believed they had been terminated when their division was sold to Henkel, while there is no testimony here that suggests that plaintiffs had such an understanding of the events that transpired.

Second, the Plan at issue in *Wulf* was amended subsequent to the sale to Henkel to allow distribution following the sale of a subsidiary. At the time of the sale to Henkel, the *Wulf* plan contained only a provision that required distribution upon termination of employment. In *Wulf,* therefore, we faced a very different situation. We resolved the ambiguity in the plan regarding termination by examining the intent of the parties and determined that plaintiffs had been terminated within the intended meaning of the plan. We then rejected application of the amendment that allowed discretionary distribution upon the sale of a subsidiary because we determined that the plan prohibited a retroactive amendment that had the effect of de-

creasing account balances. Conversely, in the present case, a provision allowing discretionary distribution upon the sale of a subsidiary was in force at the time of the sale. Thus, to follow *Wulf* would render this provision meaningless because it would both mandate distribution when a subsidiary was sold and make it discretionary. Under New York law, pursuant to which the Plan is to be construed, "it is a cardinal rule of contractual interpretation that a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual." *Hauser v. Western Group Nurseries, Inc.*, 767 F.Supp. 475, 488 (S.D.N.Y.1991) (citing *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assoc.*, 63 N.Y.2d 396, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984)). We therefore conclude that *Wulf* is not applicable to this case.

Having concluded that *Wulf* is inapplicable, we now decide the proper treatment of plaintiffs under the language of the Plan. As we have noted, the provisions in section 10.01 must be read together. Section 10.01(a) mandates distribution on termination of employment. Section 10.01(b), however, allows distribution, *in the Committee's discretion*, in the event of the termination of the Plan without the establishment of a successor plan, or in the event of the sale by an employer of substantially all of its assets or the sale of a subsidiary of an employer, provided that in the case of such a sale, the plan participant continues employment with the buyer.

Both plaintiffs and defendants acknowledge that the sale of Emery to Henkel was the sale of a subsidiary. *See* Brief of Plaintiffs at 10 ("The plain language of the Asset Sale Agreement between Henkel and Quantum stated that certain subsidiaries, including Emery which employed Plaintiffs, were part of the transaction."); Brief of Defendants at 21–23. We agree with defendants that it cannot have been intended that the sale of a subsidiary where participants continue employment with the buyer would give rise to both a mandatory distribution of vested benefits under section 10.01(a) and a discretionary distribution of the same benefits under section 10.01(b). Sections 10.01(a) and 10.01(b) cannot both apply in a given situa-

tion. Because all parties acknowledge that there has been a sale of a subsidiary and that plaintiffs have continued employment with the buyer, we conclude that no termination of employment within the meaning of section 10.01(a) of the Plan occurred and that section 10.01(b), rather than section 10.01(a), applies to this case.

### C.

Having concluded that section 10.01(b) controls and that the distribution of plaintiffs' accounts was left to the Committee's discretion, we next consider whether defendants breached their fiduciary duty by failing to make discretionary distributions to plaintiffs during the eighteen months between the sale of Emery and the trust-to-trust transfer. Plaintiffs claim that section 10.01(b) provided defendants with discretionary authority to distribute the ESOP funds to plaintiffs and that defendants breached their fiduciary duties by allowing the trust-to-trust transfer to occur. Plaintiffs maintain that defendants had a duty to distribute the ESOP funds if that was the prudent alternative, irrespective of Quantum's business decision to effect a trust-to-trust transfer. Defendants respond that a distribution would have precluded the trust-to-trust transfer contemplated by the Employee Agreement, and given that the decision to make the trust-to-trust transfer was a corporate business decision, defendants had no power or duty to override that decision.

We have held that "[u]nder ERISA, purely business decisions by an ERISA employer are not governed by section 1104's fiduciary standards." *Berlin v. Michigan Bell Tele. Co.*, 858 F.2d 1154, 1163 (6th Cir. 1988). There is no dispute that Quantum's decision to arrange a trust-to-trust transfer was not a fiduciary one. *See* Brief of Plaintiffs at 33; *see also Blaw Knox Retirement Income Plan v. White Consol. Indus., Inc.*, 998 F.2d 1185, 1189 (3rd Cir.1993) (holding that decision to transfer pension plans to an acquiring company is a "corporate business decision outside the scope of ERISA's protective rules"), *cert. denied,* —— U.S. ——, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994). Clearly, distribution of the ESOP funds be-

fore the trust-to-trust transfer would have made such a transfer impossible. We, therefore, conclude that defendants cannot be held to have breached their fiduciary duty to plaintiffs by virtue of their failure to override a corporate business decision. *See Bryant v. Int'l Fruit Prod. Co.*, 886 F.2d 132, 134 (6th Cir.1989) (per curiam) (holding that trustees did not breach fiduciary duty by failing to reverse company's decision to amend plan).

### D.

■ We next address the district court's determination that defendants' inaction was not a breach of their fiduciary duties. Plaintiffs argue that defendants breached their fiduciary duties by failing to diversify or liquidate the ESOP funds during the pendency of the trust-to-trust transfer. Defendants counter that the terms of the Plan did not give them any discretion to diversify or liquidate the ESOP funds.

We conclude that the purpose and nature of ERISA and ESOPs preclude a plan's per se prohibition against diversification or liquidation. ERISA was enacted in 1974 to provide retirement security to employees by regulating the structure and operation of retirement plans. *See Moench v. Robertson*, 62 F.3d 553, 560 (3d Cir.1995) ("Noting the rapid growth of [private pension plans and other employee benefit plans], Congress set out to 'assur[e] the equitable character of [employee benefit plans] and their financial soundness.'") (quoting *Central States, Southeast and Southwest Areas Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 570, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985) (quoting statute)). ERISA seeks to accomplish its goal of employee protection "by requiring such plans to name fiduciaries and by giving them strict and detailed duties and obligations." *Moench*, 62 F.3d at 560.

In addition to the general standards governing the administration of plans qualified under its terms, ERISA also contains specific provisions governing ESOPs. An ESOP is an ERISA plan that invests primarily in "qualifying employer securities," which typically are shares of stock in the employer creating the plan. 29 U.S.C. § 1107(d)(6)(A). Congress envisioned that an ESOP would function both as "an employee retirement benefit plan and a 'technique of corporate finance' that would encourage employee ownership." *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993). Because of these dual purposes, ESOPs are not designed to guarantee retirement benefits, and they place employee retirement assets at much greater risk than the typical diversified ERISA plan. *Moench*, 62 F.3d at 568 (quoting *Martin*, 965 F.2d at 664).

Despite this recognition that ESOPs place employee assets at a greater risk, the purpose of ESOPs cannot override ERISA's goal of ensuring the proper management and soundness of employee benefit plans. *See Martin*, 965 F.2d at 665. Therefore, a plan provision that completely prohibits diversification of ESOP assets necessarily violates the purposes of ERISA. ERISA provides that a fiduciary may only follow plan terms to the extent that the terms are consistent with ERISA. 29 U.S.C. § 1104(a)(1); *Ershick v. United Missouri Bank of Kansas City*, 948 F.2d 660, 666 (10th Cir.1991). In *Moench*, the Third Circuit held that a fiduciary's argument that he was prohibited from diversifying an ESOP under the terms of the plan that he administered was untenable because it was "inconsistent with ERISA inasmuch as it constrain[ed] the [fiduciary's] ability to act in the best interest of the beneficiaries." *Moench*, 62 F.3d at 567 (citing *Kuper v. Quantum Chem. Corp.*, 852 F.Supp. 1389, 1395 (S.D.Ohio 1994)). We agree and thus reject defendants' argument that the Plan provisions left them no discretion to diversify.

■ Having concluded that the Plan may not be interpreted to include a per se prohibition against diversifying an ESOP, we next examine the contours of an ESOP fiduciary's duty. Plaintiffs argue that defendants' failure to investigate liquidating or diversifying the ESOP in light of the relevant circumstances of this case was a breach of defendants' fiduciary duty under ERISA. Defendants respond that the district court properly determined that their conduct did not rise to the level of a breach.

ERISA imposes high standards of fiduciary duty upon those responsible for administering an ERISA plan and investing and disposing of its assets. 29 U.S.C. § 1104(a)(1). This court has explained that the fiduciary duties under ERISA encompass three components. The first is a "duty of loyalty" pursuant to which "all decisions regarding an ERISA plan 'must be made with an eye single to the interests of the participants and beneficiaries.' " *Berlin v. Michigan Bell Tele. Co.*, 858 F.2d 1154, 1162 (6th Cir.1988) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982)). The second obligation imposed under ERISA, the "prudent man" obligation, imposes "an unwavering duty" to act both "as a prudent person would act in a similar situation" and "with single-minded devotion" to those same plan participants and beneficiaries. *Id.* Finally, an ERISA fiduciary must " 'act for the exclusive purpose' " of providing benefits to plan beneficiaries. *Id.* (quoting *Donovan*, 680 F.2d at 271). If a fiduciary fails to meet these high standards, he may be held personally liable for any losses to the plan that result from his breach of duty. 29 U.S.C. § 1109(a).

In drafting the ESOP provisions of ERISA, Congress intended to encourage employees' ownership of their employer company. In order to promote this goal, Congress carved out specific exceptions to certain fiduciary duties in the case of an ESOP. For example, an ESOP fiduciary is "exempted from ERISA's duty to 'diversify the investments of the plan.' " *Martin*, 965 F.2d at 665 (quoting 29 U.S.C. § 1104(a)(1)(C) and (2)). Thus, as a general rule, ESOP fiduciaries cannot be held liable for failing to diversify investments, regardless of whether diversification would be prudent under the terms of an ordinary non-ESOP pension plan. ESOPs also are exempted from ERISA's "strict prohibitions against self-dealing, that is 'deal[ing] with the assets of the plan in his own interest or for his own account.' " *Martin*, 965 F.2d at 665 (quoting 29 U.S.C. § 1106(b)(1)).

However, the statutory exemptions for ESOPs in ERISA

do[ ] not relieve a fiduciary ... from the general fiduciary responsibility provisions of [§ 1104] which, among other things, require a fiduciary to discharge his duties respecting the plan solely in the interests of plan participants and beneficiaries and in a prudent fashion ... nor does it affect the requirement ... that a plan must be operated for the exclusive benefit of employees and their beneficiaries.

*Martin*, 965 F.2d at 665 (quoting 44 Fed. Reg. No. 168 at p. 50369 (August 28, 1979)). Thus, "ESOP fiduciaries must, then, wear two hats, and are 'expected to administer ESOP investments consistent with the provisions of both a specific employee benefits plan and ERISA.' " *Moench*, 62 F.3d at 569 (quoting *Kuper v. Quantum Chem. Corp.*, 852 F.Supp. 1389, 1395 (S.D.Ohio 1994)).

These competing concerns make it more difficult to delineate the responsibilities of ESOP trustees. In *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir.1983), the Fifth Circuit elaborated on this conflict:

On the one hand, Congress has repeatedly expressed its intent to encourage the formation of ESOPs by passing legislation granting such plans favorable treatment, and has warned against judicial and administrative action that would thwart that goal. Competing with Congress' expressed policy to foster the formation of ESOPs is the policy expressed in equally forceful terms in ERISA: that of safeguarding the interests of participants in employee benefit plans by vigorously enforcing standards of fiduciary responsibility.

*Id.* at 1466 (footnotes omitted). This conflict becomes particularly evident when an employee claims that a fiduciary breached his ERISA duties by failing to diversify an ESOP.

In *Moench*, the Third Circuit attempted to find "a way for the competing concerns [of ERISA fiduciaries and ESOPs] to coexist." *Moench*, 62 F.3d at 570. In determining that subjecting an ESOP fiduciary's investment decisions to a strict standard of review was inappropriate, the Third Circuit noted that such scrutiny "would render meaningless the ERISA provision excepting ESOPs from the

duty to diversify." *Id.* This, in turn, would risk transforming ESOPs into ordinary pension plans, thus frustrating Congress's desire to encourage employee ownership and contravening the intent of the parties.

The Third Circuit found that the better balance between these concerns was achieved by measuring a fiduciary's decision to continue investing in employer securities for an abuse of discretion. *Moench,* 62 F.3d at 571. Thus, it held that "keeping in mind the purpose behind ERISA and the nature of ESOPs themselves, ... an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion...." *Moench,* 62 F.3d at 571. The court further explained that in attempting to rebut the presumption, the plaintiff must show that the ERISA fiduciary could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities. However, the court cautioned that "[i]n determining whether the plaintiff has overcome the presumption, the courts must recognize that if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive." *Id.* (citing *Kuper,* 852 F.Supp. at 1395).

We agree with and adopt the Third Circuit's holding that a proper balance between the purpose of ERISA and the nature of ESOPs requires that we review an ESOP fiduciary's decision to invest in employer securities for an abuse of discretion. In this regard, we will presume that a fiduciary's decision to remain invested in employer securities was reasonable. A plaintiff may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision.

In support of their contention that defendants breached their fiduciary obligation to diversify or liquidate the ESOP, plaintiffs point to the fact that defendants admit that they did not consider diversifying or liquidating the ESOP despite their intimate knowledge of Quantum's financial woes and their awareness that Quantum's Chief Executive Officer, John Hoyt Stookey, sold his shares of Quantum stock in November 1989. Plaintiffs also argue that defendants should have considered diversifying or liquidating the ESOP in light of the protracted time period between the sale of the Emery Division and the completion of the trust-to-trust transfer. In this regard, plaintiffs note that during this period, they no longer had the same interest in Quantum that they had when they were employees of Quantum, and thus they no longer received the same benefits from employee ownership that Congress envisioned when it exempted ESOPs from diversification requirements.

We conclude that these arguments are not sufficient to rebut the presumption that defendants acted reasonably in continuing to hold Quantum stock. Plaintiffs' first argument focuses on defendants' failure to investigate the appropriateness of diversifying or liquidating the ESOP in light of the substantial decline in the value of Quantum stock. A fiduciary may breach his duties to plan beneficiaries by failing to investigate and evaluate the merits of his investment decisions. *Fink v. National Savings and Trust Co.,* 772 F.2d 951, 955 (D.C.Cir.1985); *see also id.* at 962 (Scalia, J., concurring in part and dissenting in part) ("Breach of the fiduciary duty to investigate and evaluate would sustain an action to enjoin or remove the trustee, ... or perhaps even recover trustee fees paid for the investigative and evaluative services that went unperformed.") (footnotes omitted). However, a fiduciary's failure to investigate an investment decision *alone* is not sufficient to show that the decision was not reasonable. Instead, to show that an investment decision breached a fiduciary's duty to act reasonably in an effort to hold the fiduciary liable for a loss attributable to this investment decision, a plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan. *See Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 279 (2d Cir.1992)

("[P]roof a causal connection ... is required between a breach of fiduciary duty and the loss alleged."). In order to establish this causal link, a plaintiff must demonstrate that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident. *Fink,* 772 F.2d at 962 (D.C.Cir.1985) (Scalia, J., concurring in part and dissenting in part).

In this case, plaintiffs merely assert that defendants' decision to continue to hold Quantum stock was unreasonable because defendants were aware of events that would continue to cause Quantum's stock to decline in value. Plaintiffs also note that defendants should have recognized the unreasonableness of holding Quantum stock when Stookey sold his shares. On the other hand, defendants presented evidence indicating that a reasonable fiduciary would have continued to hold Quantum stock during the period at issue in this case. They pointed out that the price of Quantum stock fluctuated significantly during this period and that several investment advisors recommended holding Quantum stock. In light of defendants' evidence, plaintiffs' allegations are insufficient to rebut the presumption of reasonableness that we afford defendants' conduct.

We also conclude that plaintiffs' argument that defendants' failure to consider diversifying or liquidating the ESOP was a breach of their fiduciary duties, in light of the extended time period between the sale of Emery and the trust-to-trust transfer and in light of plaintiffs' altered interest in Quantum during this period, is insufficient to rebut the presumption of reasonableness. As earlier discussed, we have determined that plaintiffs were not terminated within the meaning of section 10.01(a) at the time of the sale. Based on this determination, we conclude that the Plan was a Quantum ESOP until the completion of the transfer and that plaintiffs' altered interest in investing in Quantum stock did not affect defendants' role as fiduciaries of an ESOP. Moreover, defendants did not control the timing of the trust-to-trust transfer. Therefore, even if defendants should have considered plaintiffs' altered interest in Quantum in light of the extended period preceding the trust-to-trust transfer,

this factor alone is not sufficient to prove that a reasonable fiduciary would have acted differently under the circumstances. We conclude that plaintiffs have failed to present sufficient evidence that a reasonable fiduciary would have diversified or liquidated the ESOP. Accordingly, we hold that the district court did not err in determining that defendants' failure to diversify or liquidate the ESOP funds was not a breach of their fiduciary duties.

## III.

For the reasons stated, the judgment of the district court is **AFFIRMED**.