George T. GLENNIE, Deanna Gougeon, Thomas A. Grueter, Shirley A. Robbins, Frederick Randolph, Robert J. Tyson, Ruby Shrock, all individually, on behalf of themselves, as representatives of a class of plaintiffs who are similarly situated, Plaintiffs,

v.

ABITIBI–PRICE CORPORATION, a Delaware corporation, William M. Mercer, Incorporated, a Michigan corporation, James Gatward, Individually, and William M. Mercer Asset Planning, Inc., a Kentucky corporation, Defendants.

No. 4:94–CV–25.

United States District Court,
W.D. Michigan, Southern Division.

Jan. 26, 1996.

Alan H. Silverman, Timothy Howard Shaffer, Silverman, Rodbard & Smith, PC, Kalamazoo, MI, for plaintiffs.

Charles S. Mishkind, Miller, Canfield, Paddock & Stone, Grand Rapids, MI, Stuart H. Bompey, Orrick, Herrington & Sutcliffe, New York City, for Abitibi–Price Corporation and James Gatward.

Thomas F. Koernke, Boyden, Waddell, Timmons & Dilley, Grand Rapids, MI, for William M. Mercer Asset Planning, Inc.

### OPINION

QUIST, District Judge.

### I. *NATURE OF CASE*

Plaintiffs are former employees of Abitibi–Price Corporation and participants in that company's 401(k) retirement program. 29 U.S.C. § 401(k). The plaintiffs filed a Complaint against Abitibi Price Corporation, William M. Mercer, Inc., William M. Mercer Asset Planning, Inc. and James Gatward on February 11, 1994, pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1101 *et seq.* The Complaint alleges that defendants violated their fiduciary duties on February 14, 1991, when defendants caused the 401(k) plan to purchase a Guaranteed Investment Contract (GIC) from Mutual Benefit Life Insurance Company (MBL) for a part of the fixed income portion of the employees' 401(k) investments. Plaintiffs also claim that even if defendants did not violate their duties when the Abitibi Plan purchased the GIC, defendants violated their fiduciary duties when they failed to properly monitor the MBL investment and failed to make a timely termination of the investment.

■ A GIC is a contract under which the insurance company issuer is obligated to repay the principal deposit at a designated future date and to pay interest at a specified rate over the duration of the contract. The amount of return is usually based on the length of the contract. There are no specific assets formally set aside by the insurance company to assure payment of the GIC. Rather, a GIC is a general, unsecured obligation of the insurance company issuer.

Plaintiffs' First Amended Complaint contained seven (7) counts. Counts I and II are against Abitibi–Price Corporation and James Gatward (collectively the "Abitibi defendants") for breach of duty to properly and independently investigate the merits of the MBL investment. Count III alleges a breach of the Mercer defendants' duty to properly and independently investigate the merits of the MBL investment. Counts IV and V allege a breach of duty to diversify against the Abitibi defendants. Counts VI and VII allege a breach of duty by the Abitibi defendants to monitor and act after the MBL investment was made.

On August 25, 1994, this Court entered an order granting plaintiffs' motion for certification of class action. On June 14, 1995, William M. Mercer Incorporated was dismissed on stipulation of the parties. On August 21, 1995, this Court entered summary judgment for the defendants on Counts IV and V. The remaining counts were tried for approximately two weeks. The Court has received post trial briefs and has heard post trial oral arguments. This Opinion constitutes the Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52.

### II. *BACKGROUND FACTS*

#### A. *The Defendants*

The remaining defendants and other important figures in this case are as follows:

*Defendant Abitibi–Price Corporation* is one of the world's largest producers of newsprint and is based in Toronto, Canada. In 1986, Abitibi created a defined contribution employee pension benefit plan, the Abitibi–Price Tax Reduction Plan (Plan), commonly known as a 401(k) plan. The Plan covered many of its United States employees, including employees at its Alpena, Michigan and Troy, Michigan operations.

*Defendant James Gatward* was Secretary–Treasurer of Abitibi between 1986 and 1992. He was responsible for administration of the Plan.

*Defendant William Mercer Asset Planning, Inc.* (MAP) is a wholly-owned subsidiary of William M. Mercer, Incorporated. MAP has available to it a large amount of

information regarding the financial status and performance of insurance companies. For a fee, MAP will provide that information to its clients and will, for a fee, provide an analysis of that information to assist clients in making fiduciary decisions. *James Hiner* was a principal with MAP, and is the person who had primary contact with Abitibi and Gatward.

*Mutual Benefit Life Insurance Company* (MBL) is the insurance carrier that issued the GIC purchased by the Plan on February 14, 1991. MBL was established in 1846. In February 1991, it was the 18th largest insurance company in the United States with approximately $13.5 billion in total assets. MBL had capital, surplus and mandatory securities valuation reserves totaling about $576 million. Prior to the Plan's purchase of the MBL GIC, MBL had never failed to meet any obligation when it matured. MBL voluntarily entered Rehabilitation under the authority of the New Jersey State Insurance Commissioner on July 16, 1991. MBL is currently in Rehabilitation.

Originally, the fixed income portion of the Abitibi 401(k) Plan was invested in a single insurance annuity contract with the Hartford Insurance Company. In December 1986, Abitibi hired MAP as a consultant for the fixed income portion of its 401(k) Plan. Afterwards, MAP drafted investment guidelines which Abitibi adopted. The relevant objectives and guidelines are attached. Abitibi terminated its annuity contract with Hartford and began a program of investing the fixed income portion of the Plan in a series of GIC's and Bank Investment Contracts (BIC's)[1] offered by a variety of insurance companies and banks. Neither Abitibi nor the Plan paid MAP a fee based on the amount of Plan assets. Rather, MAP was paid a fee on a case by case basis for its assisting the Plan in making specific, discrete investments. Over a period of five years, MAP assisted the Plan in making five purchases of GIC's.

### B. *The Purchase Of The MBL GIC*

In 1990, the Plan had total assets of approximately $11.3 million, of which approximately $8.7 million was dedicated to the fixed income portion of the Plan. Approximately $6.9 million was invested in three GIC's with the Home Life Insurance Company, Crown Life Insurance Company and Provident National Insurance Company. Approximately $1.8 million was invested in a BIC with Bankers Trust.

In 1990 and 1991, GIC's were a well-established investment vehicle for the fixed income portions of various retirement programs. In February 1991, about $122 billion was invested in GIC's, primarily by employee retirement plans. At year end 1990, about $769 million was invested in GIC's issued by MBL. Certain average bid prices for GIC's are reported regularly in *The Wall Street Journal.* Before February 1991, no issuer of GIC's rated as highly as MBL had ever failed to pay the GIC at maturity according to the contract.

In the Winter of 1990, Gatward contacted Hiner and asked Hiner to obtain bids for a suitable replacement investment for investments that were maturing, for unallocated employee contributions for Plan year 1990, and for new employee contributions in Plan year 1991. On January 31, 1991, MAP sent a pre-placement binder to Gatward containing information regarding prospective bidders. The pre-placement binder included financial summaries for the prospective bidders such as an "Asset Distribution Report," a "Problem Asset Report," and a "Financial Summary Report." At the time, MAP did not know that MAP was the only source of information the Plan was receiving regarding the February 1991 placement.

MAP received bids for GIC's and transmitted the bids to Gatward. Gatward and MAP decided to recommend that the Plan's investment be placed with the insurance company which met the investment guidelines of the Plan and promised the highest return for participants. The finalists in the bid offering payoff dates desired by the Plan[2] were nar-

---

**1.** A BIC is the same as a GIC except it is offered by a bank rather than an insurance company.

**2.** 50% of principal was payable on March 1, 1993; the remainder was payable on March 1, 1995.

rowed to two insurers, both of which, at that time, met the Plan's investment guideline criteria: MBL with a bid of 7.9% on the principal and John Hancock Life Insurance Company with a bid of 7.54%. Thus, there was a difference of .36% (.0036), or 36 basis points between the bids.[3] The MBL bid was 59 basis points above the mean of all bids.

Gatward personally reviewed the results of the bidding process. In conjunction with Dick Naimoli, an executive with Abitibi–Price Sales Corporation, Gatward decided that the Plan would purchase the GIC from MBL, the high bidder. According to the GIC Placement Report prepared by MAP, the reason that MBL was selected over John Hancock is as follows:

### PLACEMENT SUMMARY

The Mutual Benefit bid of 7.90% was the highest absolute rate with acceptable contract terms for Quote II. In addition, it provided a 20 basis point rate premium for extending the contract approximately six months compared to Quote I. It was considered the most attractive bid, and selected for the following reasons:

- Mutual Benefit's average credit quality of "AA" slightly enhanced the credit quality of the portfolio; thirty-one basis points was seen as a reasonable spread for the variance in quality between Mutual Benefit and John Hancock ("AAA"), given the length of the contractual obligation, and the overall credit quality of the portfolio.

- The 20% book-value corridor for withdrawals due to Employer-initiated events was considered acceptable. The 15 basis point rate premium was considered sufficient to offset the potential market-value risk, especially in light of anticipated cash flow needs.

### CONCLUSIONS

The following steps were taken to meet the current goals of Abitibi–Price Corporation and to support the Fund's long-term objectives:

1. A new insurance carrier was added to the portfolio;
2. The average weighted credit quality of the portfolio was maintained at "AA–";
3. The laddered maturity structure was maintained; and
4. A highly competitive rate, with acceptable contract terms, was obtained, especially in light of the current interest rate environment.

MAP did not obtain any information about MBL other than the information provided by the public rating services and the financial data from the National Association of Insurance Commissioners. MAP did not obtain MBL's 1990 year-end financial filings before the placement because this report was not available to anyone until at least March 1991. Quarterly filings of MBL were available in 1990, but the latest financial information Hiner reviewed regarding MBL was as of December 31, 1989.

In deciding to purchase the MBL GIC, the Abitibi defendants did not conduct any independent financial investigation; nor did they analyze the financial data that was given to them by MAP. In measuring the risk of MBL, the Abitibi defendants relied solely upon the ratings supplied by MAP.

Once a decision had been made regarding which GIC would be purchased, the mechanics of the purchase transaction were handled entirely by MAP. The Plan purchased the GIC from MBL effective February 14, 1991. The Plan invested approximately $3.4 million in the MBL GIC.

### C. *MBL's Ratings Before The Purchase*

There are several ratings agencies that rate the claims paying ability of insurance companies in order to help potential purchasers of insurance contracts or policies evaluate the financial strength of the insurance com-

---

**3.** The 7.54% comes from Plaintiffs' Proposed Findings of Fact, no. 25 and plaintiffs' expert Willard Goodman's report. The defendants mention a 34 basis point differential. Even though page 3 of MAP's GIC Placement Analysis shows the MBL bid of 7.90% and the John Hancock bid at 7.50%, a spread of 40 basis points, page 4 of the same report mentions a 31 point basis spread between MBL and John Hancock. In any event, the exact amount of the differential, between 40 and 31 basis points, does not make any difference in this analysis.

panies. A.M. Best Company. (Best) is the oldest of these ratings agencies. Best only analyzes the published financial data filed with the regulators by the insurance companies. Best consistently rates the insurance companies higher than do other ratings agencies. In February 1991, the Best ratings were unreliable. Standard & Poor's Insurance Rating Services (Standard & Poor's) and Moody's Investor Service (Moody's) are associated with companies well known for their ratings of corporate and governmental issuers of debt instruments. They have been rating insurance companies for less time than Best—since the 1980's. Unlike Best, Standard & Poor's and Moody's interview the insurance companies. Standard & Poor's and Moody's ratings of insurance companies are more reliable than the Best ratings.

The ratings agencies typically warn their readers that the ratings are solely expressions of opinion and not statements of fact or recommendations to purchase, sell or hold. The ratings are not warranties and are said to be only one factor an investor should consider in making an investment.

In the nine months preceding February 14, 1991, MBL experienced two public rating service downgrades. Prior to May 10, 1990, MBL had Standard & Poor's highest rating of AAA. On May 10, 1990, Standard & Poor's lowered MBL's rating from AAA to AA+ (Excellent). Standard & Poor's AA+ rating, still within the "excellent" category, discussed MBL's strengths, such as a strong capital position, strong earnings, conservative capitalization, and good discipline in asset/liability matching. Standard & Poor's noted MBL's low exposure to junk bonds. As a rationale for its downgrade, Standard & Poor's stated that MBL was especially vulnerable to a downturn in the mortgage and real estate market, and Standard & Poor's expected further write-downs in MBL's mortgage portfolio. In June 1990, Moody's issued a credit report expressing opinion on MBL's strengths, including a shift from emphasizing GIC's, and weaknesses, such as "an above-average level of contingent liabilities." Moody's expected MBL's capitalization,

which it considered "adequate," to continue to improve and stated that MBL had conservative reserves. An August 1, 1990, Standard & Poor's Rating Analysis Report for MBL stated that MBL was especially vulnerable to any downturn in the mortgage loan and real estate market but also identified positive aspects of MBL's financial condition, such as a strong capital position, steadily improving operating leverage, and increasing capital and surplus. "S & P believes that problem mortgages could affect surplus growth, but that capitalization will remain in line with the rating." Neither Gatward nor Hiner reviewed the details of the August 1, 1990, Standard & Poor's report. On December 14, 1990, Moody's downgraded its rating of MBL from Aa2 to Aa3 to reflect a "moderate near-term rise in problem assets."[4] Moody's Aa3 rating was still an "investment grade" rating. Moody's expected the increased pressure on earnings and capital to be offset by MBL's "continued strength in group long-term disability insurance and stable earnings from life insurance."

MAP was aware of Standard & Poor's and Moody's downgrades, but MAP did not inform Gatward or Abitibi of the downgrades before the acquisition of the MBL GIC. Even after the downgrades, MBL was within the Plan's Guideline Range for claims paying ability, which were: A+ from Best, and A+ from Standard & Poor's or Moody's, admitted assets of at least $1 billion and adjusted capital and surplus of at least $100 million. *See* Attachment. On February 14, 1991, only 20 insurance companies held Standard & Poor's AAA rating.

Home Life, which had issued the GIC being replaced by the MBL GIC, had been assigned an overall quality rating two levels less than MBL. Crown Life, which had issued a GIC in Abitibi's 401(k) fixed income portfolio, had a quality rating one level less than MBL. Bankers Trust BIC and Provident National GIC, other issuers of GIC's in the Plan's fixed income portfolio, had the same overall rating as MBL.

4. In February 1991, MBL had Standard & Poor's second highest rating, AA+, Moody's fourth highest rating, Aa3, and A.M. Best's highest rating, A+.

### D. *MBL's Downgrades After The Acquisition And The Plan's Reaction*

About the beginning of March 1991, MBL filed its financial disclosure report for 1990. This report showed further deterioration in MBL's mortgage and real estate investments. As a result of MBL's disclosure for 1990, on or about May 17, 1991, approximately three months after the Plan purchased the MBL GIC, Standard & Poor's downgraded MBL's rating from AA+ to A. On May 20, 1991, Moody's downgraded MBL's rating from Aa3 to A3. These downgrades put MBL below MAP's recommended range for GIC investments and below the Plan's investment guidelines.

Gatward learned about Standard & Poor's downgrade from the May 20, 1991, *The Wall Street Journal.* The *Journal* article quotes an analyst with Standard & Poor's as saying, among other things, that the A rating was "strong ... we're not talking about a company on the edge.... But there's no way we can say a four-notch decline is normal." After reading the article, Gatward called Hiner. By telephone conversation and a letter dated May 23, 1991, Hiner discussed with Gatward the downgrade and the ramifications of an early termination of the MBL GIC. Gatward asked MAP to investigate and report to him the financial consequences of early termination of the GIC. In a letter dated May 30, 1991, MAP requested this information from MBL. After determining that the penalty for early termination was "relatively insignificant," Gatward asked MAP to prepare the papers necessary to terminate the MBL GIC. In a letter dated June 7, 1991, MAP provided Gatward with a specimen letter to MBL requesting a premature discontinuance of the GIC. On June 11, 1991, Gatward prepared a letter to be sent to MBL which was substantially similar to the specimen letter MAP submitted to Gatward. Mary Rynkowski, Gatward's secretary, typed the final draft of the discontinuance letter to MBL on June 11, 1991. She tried to get Gatward to sign the letter before he left that day. Plaintiffs note that the specimen letter from MAP to Gatward contained an indication of a facsimile transmission of the discontinuance let-

ter to MBL. This indication, however, was not meant to be an instruction to Gatward that the letter be sent by facsimile transmission; the notation was consistent with MAP's method of sending letters to insurance companies. Gatward's letter was neither "faxed" nor mailed for several days. When the letter was mailed, it was sent by ordinary mail. MBL did not receive the letter until June 21, 1991.

MBL responded to the discontinuance letter by telling MAP that the effective date of the contract discontinuance would be July 19, 1991, pursuant to the contractual requirement of a written request for termination 30 days prior to disbursement of any funds.

### E. *MBL In Rehabilitation*

On July 16, 1991, just three days before the Plan was to receive a return from MBL of the Plan's investment in the MBL GIC, the New Jersey Insurance Department froze the assets of MBL with the consent of MBL's Board of Directors, and placed MBL into Rehabilitation under the insurance law of the State of New Jersey. MBL was not placed into Rehabilitation because it was believed to be insolvent. Rather, MBL was placed into Rehabilitation because it had a cash flow problem preventing it from meeting its obligations as they matured. As a result of the New Jersey Insurance Department's actions, the Plan's GIC was frozen and the discontinuance requested by Gatward became moot. Later, MBL's assets were further written down to the extent that MBL's liabilities exceeded its assets.

In November 1994, a Rehabilitation Plan was approved by the New Jersey Superior Court, and the Rehabilitation Plan has been implemented. Under the Rehabilitation Plan, GIC holders with state insurance, such as the Plan, that agree to maintain the investment with MBL's reinsurer, MBL Life Assurance Corp., until 1999, will not suffer any loss of principal on their initial investment. These GIC holders are promised an average annual crediting rating of at least 5% interest until that date. The Plan opted into the Rehabilitation Plan in March 1994. The Plan has received interest of 7.90% for 1991, 5.75% for 1992, 5.25% in 1993 and 5.10% in 1994 from the MBL GIC. During

the Rehabilitation period, Plan participants will continue to receive some interest on the full principal in their accounts. However, participants can only conditionally withdraw assets from the frozen account without penalty.

As indicated in the previous paragraph, the principal of the Plan's investment in the MBL GIC is guaranteed by the State of Michigan pursuant to the Michigan Life and Health Insurance Guaranty Association Act. M.C.L. § 500.7701 *et seq.;* M.S.A. § 24.177701, *et seq.* Therefore, the possibility that the Plan will suffer any loss of principal because of the MBL GIC is very remote. This case, then, is solely about plaintiffs' claim that the defendants' breach of fiduciary duty caused a diminution in the amount of interest the Plan will receive on that portion of the Plan's fixed income assets that were invested in the MBL GIC.[5]

### III. *ANALYSIS*

#### A. *Arguments Advanced*

The plaintiffs point out that when MAP and Abitibi received MBL's bid in February 1991, MBL's bid was 36 basis points above the next highest bid. Hiner described MBL's bid as "aberrationally high." Plaintiffs say that because of this disparity in the bids, MAP and the Abitibi defendants should have been put on notice that MBL probably had a cash flow problem. Plaintiffs then argue that notice of a probable cash flow problem should have led MAP and the Abitibi defendants to further investigate the financial condition of MBL, and, if they had done so, they would have discovered that MBL did, indeed, have a cash flow problem. Once the cash flow problem was discovered, plaintiffs say, a prudent fiduciary would not have invested in an MBL GIC. Plaintiffs allege that defendants saw outdated financial data and relied solely upon the ratings issued by the rating companies, Best, Standard & Poor's and Moody's. Concerning the heavy reliance upon the ratings agencies, plaintiffs claim the defendants did not pay sufficient

attention to the downgrades that occurred within the nine months prior to February 14, 1991. Plaintiffs say that the Plan should have purchased the GIC from John Hancock instead of MBL.

Defendants claim that they acted prudently in purchasing the MBL GIC because MBL had a long history of paying its obligations, because no highly rated GIC issuer had ever defaulted on a GIC since the GIC market opened in 1969, and because defendants relied upon the financial analyses and ratings of experienced, dependable, and independent rating companies. Defendants say that the ratings of these rating companies did not indicate any financial weakness that would lead to MBL's being placed in Rehabilitation. Defendants also argue that the Abitibi defendants showed prudence because they used MAP to help them select the MBL GIC. Defendants claim that there was no public indication before the February 1991 bid, that MBL had a cash flow problem. Defendants maintain that even if an expensive expert analysis of the financial information filed by MBL had been made,[6] the analysis would not have disclosed anything indicating MBL had a cash flow problem leading to Rehabilitation.

#### B. *Legal Standard*

The prudent person standard of care set forth in ERISA provides:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;....

ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

◼ A court must consider the prudence of a fiduciary's conduct at the time of the investment. *DeBruyne v. Equitable Life As-*

---

**5.** This Court recognizes that plan participants who invest in fixed income financial vehicles give up opportunity for market advances (and retreats) in order to have the assurance of relative safety of principal and a steady, known return.

**6.** The analysis would have taken several hours and would have cost between 30 and 35 basis points.

*surance Soc. of the United States,* 920 F.2d 457, 465 (7th Cir.1990). As stated in *Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir.1984), *cert. denied, Cody v. Donovan,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984):

> Prudence is measured according to the objective "prudent person" standard developed in the common law of trusts. The court's task is to inquire "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." A trustee's lack of familiarity with investments is no excuse: under an objective standard trustees are to be judged "according to the standards of others 'acting in a like capacity and familiar with such matters.'" (Citations omitted.)

■ Even if a fiduciary fails to make an adequate investigation, that fiduciary is not liable if a hypothetically prudent fiduciary would have made the same decision after making an adequate investigation. In *Kuper v. Iovenko,* 66 F.3d 1447, 1459 (6th Cir.1995), the Sixth Circuit said:

> ... a fiduciary's failure to investigate an investment decision *alone* is not sufficient to show that the decision was not reasonable. Instead, to show that an investment decision breached a fiduciary's duty to act reasonably in an effort to hold the fiduciary liable for a loss attributable to this investment decision, a plaintiff must show a causal link between the failure to investigate and the harm suffered by the

plan.... In order to establish this causal link, a plaintiff must demonstrate that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.

The Eighth Circuit has characterized the nature of the Court's inquiry as follows:

> To say that their [fiduciaries'] decision was objectively reasonable would require taking into account everything that the trustees *should have known* at the time of their decision.... Thus, the causal connection between breach and loss, like breach itself, is a fact-intensive inquiry....

*Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 919 (8th Cir.1994).[7]

C. *The Plaintiffs Failed to Establish by a Preponderance of the Evidence That a Reasonable Investigation Would Reveal to a Prudent Fiduciary That the Purchase of the MBL Was Improvident When Made*[8]

■ For the purposes of this analysis, this Court assumes that the defendants failed to employ the appropriate methods to investigate the merits and structure of the MBL GIC—with or without the "aberrational" bid by MBL. This Court must now decide whether a hypothetical prudent fiduciary could have made the objective decision to purchase the MBL GIC after taking into account everything that they should have known at the time of their decision.

In this Court's judgment, an adequate investigation would have informed a prudent fiduciary that the principal of the MBL GIC

---

**7.** The case of *In re Unisys Savings Plan Litig.,* 74 F.3d 420 (3d Cir.1996) involves the purchase of a GIC from an insurance company, Executive Life Insurance Company of California, that became insolvent and went into state conservatorship. In *Unisys,* the district court, granting summary judgment to the defendants, held that the defendants had not violated their fiduciary duties to the Unisys savings plan on the grounds that the defendants looked at the financial statements of Executive Life, sought the opinion of an expert, and, most significant, "relied on the ratings of Standard & Poor's and Moody's, both of which gave Executive Life high ratings of A+ or AAA." *In re Unisys Savings Plan Litig.,* No. 91–3067, 1995 WL 29048, at *4 (E.D.Pa. Jan. 26, 1995). With a thorough review of the record, the Circuit Court of Appeals pointed out that there were

material, disputed facts and remanded the case for trial. The facts of the defendants' purchase of the Executive Live GIC are significantly different from the facts as found in the case at bar. Furthermore, *Unisys* was decided under a standard wherein all genuine and material issues of fact had to be construed in favor of plaintiffs. Thus, except for the established, general principles stated in *Unisys, Unisys* has little precedential effect on the issue of whether the decision to purchase the MBL GIC was objectively prudent.

**8.** Because of the findings in this section, this Court does not reach the issue of whether MAP was a fiduciary under 29 U.S.C. § 1002(21)(A)(ii).

was fully guaranteed by the State of Michigan. Therefore, at all times the principal of the investment was safe; the risk was solely that there would be a diminution in interest. This would give a prudent fiduciary considerable comfort.

In addition, this Court believes that even though the ratings of Standard & Poor's and Moody's are not *per se* determinative of prudence, they are significant factors in deciding whether an investment is prudent. That is, the ratings are important information that a fiduciary should consider in deciding whether a particular GIC should be purchased for plan participants. This would be especially true of low ratings; a fiduciary of a plan would almost certainly violate the fiduciary duty if the fiduciary caused the plan to purchase a GIC in an insurance company with ratings below "investment grade." Consistently high ratings from the ratings agencies are also important. In the instant case, even though there were two downgrades of MBL in the months preceding February 14, 1991, and even though these downgrades and other reports pointed out MBL's exposure to nonperforming mortgages and real estate, the downgrades and reports are balanced with favorable comments about MBL. Even considering the exposure, the ratings remained "investment grade." Further, as previously noted, even after the 1990 downgrades, MBL fit into the Plan's ratings guidelines.

In support of their claim the investment was not objectively prudent, the plaintiffs called their expert witness Mr. Peter Chapman to analyze the warnings and financial data that were available to MAP and the Abitibi defendants before the purchase of the GIC. This Court finds as a matter of fact that Chapman was unpersuasive in showing that it was imprudent for a fiduciary similarly situated to defendants to have purchased an MBL GIC in February 1991. Chapman does have expertise in the financial analysis of insurance companies issuing GIC's. Chapman's experience was limited solely to the perspective of insurance companies bidding on GIC's. Chapman did not have any experience as a fiduciary of retirement plans who has responsibility for establishing investment vehicles for plan participants. Chapman

misunderstood the meaning of some of the financial data that had been reported by MBL. For example, as explained by William Clark, a vice-president of MBL, the alleged "withdrawals" of large amounts of money from GIC's was not the result of panic over MBL GIC's so much as ordinary, scheduled maturities and even reinvestments of GIC's. Also, Chapman failed to correct the "low surplus to liability ratio" for the effect of MBL's corporate-owned life insurance business.

In addition to being mistaken in some respects, Chapman's testimony had problems similar to the problems with the testimony of the expert in *Cherokee Ins. Co. v. E.W. Blanch Co.,* 66 F.3d 117 (6th Cir.1995). *Cherokee* did not involve fiduciary duties under ERISA. Rather, it involved the question of whether an insurance broker used due care in examining the strength of reinsurers that it recommended to the plaintiff. In attempting to develop support for its claim that the insurance broker had been negligent in placing the reinsurance, Cherokee Insurance engaged Bernard Webb as an expert witness. Webb performed an in-depth analysis of the financial information provided by the reinsurers. While not concluding that the reinsurers were insolvent when the contracts were placed, Webb opined that defendant should have known that the reinsurers were financially troubled and represented poor security. The magistrate judge who tried *Cherokee* and the Sixth Circuit agreed that Webb's expert testimony did not show negligence for the following reasons: there was no evidence in the record that any reinsurance broker similarly situated to the defendant performed the same type of analysis as did Webb; Webb had never been a broker himself and had no expertise in industry practice; Webb could not say that any of the ratios he employed signaled the actual cause of failure of the reinsurers; Webb never held his ratios out to be predictors of insolvency; and a subsequent test showed that the ratios were not predictors of insolvency because other companies with ratios similar to the insolvent reinsurers did not become insolvent.

Similarly, Chapman could not testify that, before deciding to invest in a GIC, a prudent fiduciary of an ERISA plan would have made the same analysis that he had made. Chapman never analyzed bids on GIC's from a buyer's perspective. Also, because insurers with similar ratios did not go into Rehabilitation, the ratios used by Chapman were not necessarily signals of cash flow problems leading to Rehabilitation. Furthermore, an insurance company that would have appeared safe according to Chapman's ratios regarding mortgages and real estate, Executive Life, became insolvent due to heavy investment in junk bonds.

As their expert, the Abitibi defendants introduced the testimony of Mr. Frederick S. Townsend of The Townsend & Schupp Company, an insurance rating firm. Townsend has some experience advising purchasers of GIC's about the wisdom of purchasing a particular GIC. Townsend opined that a prudent fiduciary analyzing the consistent high ratings, the size of the Plan's GIC in comparison to MBL's size, MBL's surplus and assets, and the other MBL GIC holders prior to March 1991, would have concluded that MBL was a prudent investment. More important, Townsend opined that even after the release of MBL's 1990 financial data, which occurred about early March 1991, there was no reason to believe that MBL would not be able to meet its contractual obligations. In explanation of his opinions regarding the Plan's February 1991 investment and the Plan's decision not to terminate the MBL GIC immediately upon MBL's release of its 1990 financial information and first quarter 1991 financial information, Townsend recognized the liquidity problems caused by the life insurance industry's heavy investments in commercial mortgage loans—the change in depreciation schedule in the later 1980's, the overbuilding in the early 1980's, and the defaults in the banking and savings and loan industries. Townsend, however, also recognized the positive aspects of MBL's reports—such as the natural distortion to cash flow being caused by net reduction in GIC's and the corporate-owned life insurance and group health insurance being written by MBL, higher earnings on investments than the industry average, MBL's upwards earn-

ings trend, a declining surrender ratio on the individual life insurance business (the ratio was about half the industry average), a nominal level of GIC surrenders, an operating expense ratio on two major lines of business which were below industry average, and his explanation of MBL's capital ratio being 80% of industry average. While Townsend's testimony has certain problems, it is essentially more reliable than Chapman's, and this Court accepts Townsend's opinions.

In February 1991, in addition to knowing of the State of Michigan's guaranty, MBL's consistently high ratings, the financial information analyzed by Chapman and Townsend, and having reached a reasonable conclusion that MBL was a solvent insurer that did not have a cash flow problem that would prevent it from paying the GIC at maturity, a prudent fiduciary of the Plan would also have known the following:

1. There had been no failure of a GIC issuer that had ratings as high as did MBL.

2. MBL was the fourteenth largest insurance company in the United States and had been in existence since 1846.

3. MBL had always been able to meet its obligations.

4. There had been no indication in any popular financial media that MBL was running into cash flow problems.

5. MBL had an excellent reputation.

6. MBL had assets of over $13 billion and surplus of about $576 million.

7. MBL had minimal exposure to junk bonds, the cause of Executive Life's failure and the subject of much media attention in 1990 and 1991.

8. MBL offered greater return than other GIC's for whatever additional risks were present.

This Court thinks that the timing of this particular investment is also important. It is easier in 1995 and 1996 to question the financial integrity of highly rated, reputable, large, and apparently solid insurance companies such as MBL because we now know the experience of Executive Life and MBL. For the purposes of deciding this lawsuit, second

guessing with 20–20 hindsight is precisely the type of analysis in which this Court should not engage.

In summary, the plaintiffs failed to persuade this Court by a preponderance of the evidence that, even if a prudent fiduciary had made a thorough financial analysis of MBL in February 1991, the fiduciary would have concluded that MBL was facing a cash flow problem that would put MBL into rehabilitation before the GIC was due. Likewise, plaintiffs failed to convince this Court by a preponderance of the evidence that, based upon the information available in February 1991, it was an imprudent risk to obtain the higher interest rate offered by MBL. In other words, the plaintiffs failed to convince the Court by a preponderance of the evidence that it is more likely than not that an adequate investigation would have revealed to a reasonable fiduciary that the purchase of the MBL GIC was improvident. *Cf. Kuper v. Iovenko,* 66 F.3d 1447, 1460 (6th Cir.1995).

D. *Plaintiffs Failed To Sustain Their Burden of Proving By a Preponderance of The Evidence That Defendants Failed To Adequately Monitor The Plan's Investment or Make a Timely Termination*

■ Plaintiffs claim that the Abitibi defendants violated their duty to monitor the MBL investment after the investment was made in February 1991. Plaintiffs argue that MBL's 1990 financial statement would have been available to MAP about the end of February 1991 or the first part of March 1991. Plaintiffs state that anyone monitoring MBL's financial status who looked at the 1990 "financial statement would have learned that MBL wrote down $215 million of assets, of which $143 million impacted assets not covered by the MSVR." Plaintiffs also argue that once Gatward discovered the downgrades of MBL in May 1991, he should have acted more quickly to terminate the MBL GIC.

■ As this Court has already pointed out in its decision on defendants' Motion for Summary Judgment, the duty to monitor is separate and distinct from the duty to administer plan assets prudently. Thus, a fiduciary's responsibilities with respect to an ERISA investment do not terminate upon conclusion of an appropriate investigation and purchase of the asset. *Hunt v. Magnell,* 758 F.Supp. 1292, 1299 (D.Minn.1991). As stated by plaintiffs in their post-trial brief, "ERISA fiduciaries must monitor investments with reasonable diligence and dispose of investments which are improper to keep."

This Court does not accept the proposition that, once an ERISA plan purchases a GIC, the fiduciaries must check on the investment every day or even every month. Rather, as testified to by plaintiffs' own expert Mark Gertner, checking on a proper GIC investment approximately annually would be sufficient. When a fiduciary does receive negative information regarding a particular investment in an ERISA plan, it is that fiduciary's duty to act prudently to protect, to the extent possible, the plan from loss.

This Court believes that it was appropriate for the Abitibi defendants to rely upon MAP to forward any adverse information regarding GIC investments. After all, Gatward was the Chief Financial Officer of Abitibi with little or no experience in the insurance industry. MAP, on the other hand, was in day-to-day contact with the insurance industry and insurance industry news, and could reasonably be believed to have first access to negative information.

The February 1991, investment was made only a few weeks before MBL's 1990 information became available. This information was not brought to the attention of the Abitibi defendants by MAP, the entity upon which the Abitibi defendants were reasonably relying. Once Gatward learned about the downgrade from the May 20, 1991, *The Wall Street Journal,* he acted prudently. Even after the downgrades, MBL was still rated investment grade by Standard & Poor's and Moody's. Furthermore, the language used by the rating agencies in describing the downgrades did not suggest imminent problems. For example, Standard & Poor's stated that MBL's outlook was "stable." Both rating agencies noted that the downgrades reflected potential long-term problems.

Gatward appropriately realized the distinction between making an investment in the

first place and terminating an investment that had already been made—there were possible losses associated with a withdrawal. When he first heard of the downgrade, Gatward did not know the cost of termination. Instead of panicking, Gatward acted prudently to determine the cost to the Plan if the Plan prematurely terminated the MBL GIC. Furthermore, the letter of termination was not sent because of anticipation that MBL was going into Rehabilitation. Rather, the letter was sent because Gatward had concluded that the MBL GIC no longer met the Plan's investment criteria.

This Court also considered the fact that of the 432 MBL GIC holders, only 17% of all holders tried to prematurely terminate their contracts; only 7% made their request in sufficient time to receive their invested assets; and only 8% made their requests before the Abitibi defendants. Among those GIC holders who did not request termination are some of the most sophisticated GIC purchasers, including "GIC managers," a group of experts who specialize in analyzing, selecting, purchasing, and managing GIC portfolios for their clients.

This Court also considered the opinion of Townsend, as indicated on pages 22–23 of this Opinion.

Therefore, plaintiffs have failed to persuade this Court by a preponderance of the evidence that the Abitibi defendants violated their duty to monitor the MBL investment or their duty to make a timely termination of the investment.

### CONCLUSION

For the reasons stated in this Opinion, final judgment may be entered for the defendants on all counts.

### *Objectives and Guidelines*

OBJECTIVE

The objective of the Guaranteed Income Fund is to achieve a maximum yield with limited or no volatility in the value of underlying assets, as well as to provide maximum flexibility, given the contractual nature of the investments used in the Fund. As a result, the Fund must meet the following expectations:

- safety of principal;
- highest real rate of return consistent with safety of principal;
- liquidity in accordance with Plan provisions; and
- responsive to changing interest rate environments.

GUIDELINES

These general operating guidelines have been adopted for the Fund:

- purchase benefit-responsive contracts that accommodate normal Plan withdrawals and interfund transfers at book value;
- ladder maturing funds and reinvest at regular intervals in order to dollar-cost average and to be responsive to changing market conditions;
- diversify among contract issuers and limit the amount invested with any financial institution to 33% of the portfolio's assets;
- maintain an average weighted credit quality rating of "AA" or better. This rating will reflect the average Claims–Paying Ability Ratings for insurance companies and the Long–Term Deposit Rating for banks;
- maintain separate financial reporting by business unit, as needed;
- competitively bid all contracts to obtain the best GIC rates available under favorable contract terms; and
- monitor the full universe of financial institutions offering a GIC-type products and the following criteria to select the bidding universe for each placement:

**Insurance Companies**

1. An "A+" (Superior) rating from A.M. Best Company. Net worth or co-guarantor agreements are acceptable from a parent company, if rated "A+."

2. A minimum Claims–Paying Ability Rating of no less than "A+" from Standard & Poor's, Moody's or Duff and Phelps.

3. Admitted assets of at least $1 billion and adjusted capital and surplus of at least $100 million.