Richard WRIGHT, Greg S. Buchanan, and Darrell Hagan, Plaintiffs,

v.

OREGON METALLURGICAL CORPO-RATION dba Oremet Titanium, Carlos E. Aguirre, Dennis P. Kelly, Gary Weber, Jack Cox, Key Trust Company of the Northwest, and United Steelworkers of America Local 7150, Defendants.

No. CV 01–325–BR.

United States District Court, D. Oregon.

Aug. 6, 2002.

James C. Egan, Kryger, Alexander, Egan & Elmer, P.C., Albany, NY, Gary D. Greenwald, Leslie Blair Graden, Shayne & Greenwald Co. LPA, Columbus, OH, for Plaintiffs.

Kerry J. Shepherd, Markowitz, Herbold, Glade & Mehlaf, P.C., Portland, OR, Brian T. Ortelere, Pepper Hamilton LLP, Philadelphia, PA, Michelle Motowski Lund, Pepper Hamilton LLP, Detroit, MI, for Defendants Oregon Metallurgical Corpora-

tion, Carlos E. Aguirre, Dennis P. Kelly, Gary Weber, and Jack Cox (collectively referred to herein as the Oremet Defendants).

James M. Finn, Denise M. Graves, Schwabe, Williamson & Wyatt, P.C., Portland, OR, Brian J. Lamb, Gary L. Walters, Thompson Hine LLP, Cleveland, OH, for Defendant Key Trust Company of the Northwest.

John Bishop, McKanna Bishop Joffe, Portland, OR, Douglas L. Greenfield, Leon Dayan, Bredhoff & Kaiser, P.L.L.C., Washington, D.C., for Defendant United Steelworkers of America Local 7150.

## OPINION AND ORDER

BROWN, District Judge.

Plaintiffs bring this action against Defendants under the Employee Retirement Income Security Act of 1974 as amended (ERISA), 29 U.S.C. § 1001, *et seq.* Plaintiffs are three participants in the Employee Stock Ownership Plan (ESOP or the Plan) established by Defendant Oregon Metallurgical Corporation (Oremet).

This matter comes before the Court on three Motions to Dismiss the First Amended Complaint filed by the Oremet Defendants (# 74), Key Trust (# 69), and United Steelworkers of America Local 7150 (the Union)(# 72). For the reasons that follow, the Court **GRANTS** Defendants' Motions with prejudice and dismisses this action.

## *FACTUAL ALLEGATIONS*

The Court takes the following facts from Plaintiffs' First Amended Complaint and its attachments.

Oremet established the Plan in 1987. The Plan Agreement and the Trust Agreement set forth the terms of the Plan as amended and restated in 1989. The Plan Agreement provides the Plan is a "stock bonus plan" and an "employee stock own-

ership plan." Originally, the Plan was designed to be an ESOP "invested primarily in shares of Oremet stock." The Plan Agreement established a trust. The trust assets initially consisted of 6,267,281 shares of Oremet common stock valued at approximately $17 million. The Plan financed its purchase of these shares with a loan from Oremet. The loan was repaid in full in 1994, and all shares of Oremet stock held by the Plan were allocated to participants' accounts.

The Plan is managed by a two-person Administrative Committee (the Plan Administrators) consisting of one hourly union employee of Oremet and one salaried management employee of Oremet. Oremet's Board of Directors is responsible for appointing a Plan Trustee and both Plan Administrators.

At all relevant times, Defendants Gary Weber and Jack Cox were the Plan Administrators. Defendant Carlos E. Aguirre was a director, officer, and shareholder of Oremet. Defendant Dennis P. Kelly was Oremet's Chief Financial Officer from 1993 to 1998. Defendant Union represented approximately half of Oremet's employees and Plan participants for the purpose of collective bargaining with Oremet.

Because the Plan owned more than 50% of the outstanding shares of Oremet common stock, the Plan had the right to nominate and to select four of the nine members of the Oremet Board of Directors: two salaried employees and two union employees. In 1994, Oremet amended its bylaws to provide that the Plan would continue to nominate and to elect four of the nine members of the Board as long as the Plan owned 25% or more of the outstanding shares of Oremet common stock. In the event the Plan's ownership fell below 25%, the Plan would be able to nominate and to

elect only two members of the Board: one union and one nonunion.

Initially, the Plan allowed participants to sell up to 40% of the Oremet shares in their individual stock accounts each year as long as the participant remained employed by Oremet (the Participant Diversification Provision). Employees who ceased to be employed by Oremet were not subject to the Participant Diversification Provision and could withdraw 100% of the shares of Oremet stock allocated to their Stock Account.

In 1993 and 1994, as the six-year collective-bargaining agreement was set to expire, Oremet and the Union conducted negotiations on the terms and conditions of a new six-year agreement to be effective from August 1, 1994, to July 31, 2000. The 1994–2000 agreement was executed in the spring of 1994.

Oremet stock was traded over the counter on the NASDAQ exchange. Its price fluctuated widely between 1987 and 1997 from a low of $3.624 per share to a high of $33.875. During 1995 and 1996, the trading price of Oremet stock increased substantially. As a result, Plan participants expressed a desire for greater rights under the Participant Diversification Provision. In addition, Oremet management became concerned that increasing numbers of Oremet employees would terminate their employment in order to withdraw and to sell their Oremet stock. Acting in response to these concerns and under pressure from Plan participants, Oremet amended the Plan in May 1996 to permit Plan participants to sell increasing amounts of their Oremet stock in steps: first up to 55%; then up to 70%; and finally, after July 30, 1996, employees were allowed to sell up to 85% of their Oremet stock and to invest the proceeds elsewhere.

The May 1996 Amendments also provide the Plan would cease to be an ESOP but would remain a stock bonus plan at such time as the majority of Plan assets no longer were invested primarily in Oremet Common Stock (the Transformation Date). In addition, the May 1996 Amendments indicate the Plan's requirement that Plan assets be invested primarily in Oremet stock would be eliminated after the Transformation Date, and replaced with a requirement that Plan assets "be invested as provided in the Trust Agreement." The Trust Agreement provides "up to 100% of the assets of the Trust Fund may be invested in Company Stock," and any stock of an affiliate of Oremet counts as "Company Stock."

The Union vigorously opposed any further diversification of Plan assets even though it reluctantly agreed to the May 1996 Amendments. For this reason, the May 1996 Amendments included a "Side Agreement" between Oremet and the Union that prohibited subsequent amendment of the Plan "to permit further diversification of the Plan's investments through the sale of Oremet stock until at least the year 2000." Plaintiffs allege the Side Agreement was made in secret and was motivated by the Union's desire to maintain its representation on Oremet's Board of Directors.

On October 31, 1997, Allegheny Teledyne and Oremet publicly announced a stock-for-stock merger whereby Oremet shareholders would receive 1.296 shares of Allegheny Teledyne stock for each share of Oremet stock. Oremet stock closed at $23.4375 per share on October 31, 1997, and at $33.875 on November 3, 1997, the first trading day after the merger was announced.

On January 19, 1998, two months before the merger was consummated, a substantial group of Plan participants submitted a petition to the 12–member Plan Advisory Committee and requested the immediate

release of the remaining 15% of Oremet common stock in their Plan accounts "so as to capture the stock appreciation."

The Plan Advisory Committee met on February 9 and February 11, 1998, to discuss the petition and other matters. According to the minutes of the February 9, 1998, meeting,[1] Defendant Weber informed the Advisory Committee the Plan "was a bargained for item in the labor contract" and the Advisory Committee "did not have the authority to act on this petition without concurrence from management and the union." Although Plaintiffs allege Defendant Kelly informed the Plan Advisory Committee at the February 11, 1998, meeting that Oremet and the Union believed the 1996 Side Agreement precluded the Plan from distributing or selling additional shares of Oremet stock, the minutes of that meeting merely state "[t]he current agreement is that the last 15% of a participant's account would remain in the trust until at least the year 2000, the next scheduled labor agreement negotiations." Plaintiffs contend "the current agreement" refers to the 1996 Side Agreement.

On March 24, 1998, the merger of Oremet and Allegheny was consummated. As a result of the merger, Allegheny acquired all of Oremet's stock, and Oremet became a wholly-owned subsidiary of Allegheny. By the end of 1998, the Plan held approximately 93.3% of its assets in Allegheny Technologies[2] stock.

Plaintiffs allege the trading value of the Allegheny stock "began and continued to decrease substantially" after the merger, but Plaintiffs also allege the stock price "fluctuated dramatically." In November 1999, Allegheny instituted a reverse stock split whereby the Plan and each Plan participant received one share of Allegheny Technologies stock for each two shares of Allegheny Teledyne stock held. The Plan held 389,902 shares of Allegheny stock after the reverse split.

## PROCEDURAL BACKGROUND

Plaintiffs filed their original Complaint on March 8, 2001. Defendants filed Motions to Dismiss the Complaint on August 31, 2001. While those Motions were pending, Plaintiffs filed a Motion for Leave to Amend Complaint. The proposed Amended Complaint attempted to cure the deficiencies Defendants asserted in their Motions to Dismiss. The Court heard oral argument on the Motions to Dismiss and Motion to Amend on December 20, 2001. The Court granted Plaintiffs' Motion for Leave to Amend in part, but the Court concluded Plaintiffs' original Complaint and proposed Amended Complaint were deficient. Because the Court allowed Plaintiffs to amend their Complaint further, the Court denied Defendants' Motions to Dismiss as moot.

On January 22, 2002, Plaintiffs filed their First Amended Complaint. Defendants again moved to dismiss and the Court heard oral argument on Defendants' Motions to Dismiss on June 7, 2002.

## STANDARDS

On a motion to dismiss under Fed. R.Civ.P. 12(b), all allegations in the complaint are considered true and construed in plaintiffs' favor. *Meek v. County of Riverside*, 183 F.3d 962, 965 (9th Cir.), *cert. denied*, 528 U.S. 1005, 120 S.Ct. 499, 145 L.Ed.2d 386 (1999). A court should not dismiss a complaint, thus depriving the

---

1. The minutes of the meetings held by the Plan Advisory Committee on February 9 and 11, 1998, and October 9, 1998, are attached to Plaintiffs' First Amended Complaint as Exhibit G.

2. Allegheny Technologies is the successor to Allegheny Teledyne.

plaintiff of an opportunity to establish his or her claims at trial, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001)(quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

When a plaintiff attaches materials to a complaint, "the court is not limited by the mere allegations in the complaint. These documents, as part of the complaint, are properly part of the review as to whether plaintiff can prove any set of facts in support of its claim." *Amfac Mortgage Corp. v. Arizona Mall of Tempe*, 583 F.2d 426, 429 (9th Cir.1978).

### DISCUSSION

Plaintiffs allege all Defendants breached fiduciary duties under 29 U.S.C. § 1104(a) when they failed to diversify Plan assets and failed to investigate adequately the prudence of the Plan's continued investment in employer securities. In Addition, Plaintiffs contend Defendants violated 29 U.S.C. § 1107(a)(2), which prohibits an ERISA plan from holding more than ten percent of its assets in employer stock. Finally, Plaintiffs contend Defendants violated 29 U.S.C. § 1106 by engaging in a prohibited transaction and dealing with plan assets for the benefit of a party in interest.

Defendants argue Plaintiffs' First Amended Complaint must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim because the Oremet Plan was exempt from ERISA's diversification requirements and the ten-percent limitation. Defendants also contend Plaintiffs' claims brought under 29 U.S.C. § 1106 must be dismissed because Plaintiffs failed to identify a transaction to which the statute applies.

### I. Fiduciary Duties Under ERISA.

Under ERISA, a fiduciary is required to discharge his duties "solely in the interest of the participants and beneficiaries" and

(A) for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan [the exclusive purpose requirement];

(B) with the care, skill, prudence, and diligence under circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims [the prudence requirement];

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so [the diversification requirement]; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of ERISA.

29 U.S.C. § 1104(a)(1). In addition, ERISA generally prohibits a plan from holding more than ten percent of its assets in employer securities (the ten-percent limitation).

An eligible IAP is exempt from the diversification requirement of § 1104(a)(1)(C) and the prudence requirement of § 1104(a)(1)(B) to the extent it requires diversification. An eligible IAP also is exempt from the ten-percent limitation.

Plaintiffs acknowledge the Plan qualified as an eligible IAP and was exempt from ERISA's diversification requirements and the ten-percent limitation before the merger between Oremet and Allegheny. Plaintiffs assert, however, the Plan lost its status as an eligible IAP and became subject

to ERISA's diversification requirements and the ten-percent limitation after the merger.

## II. The Oremet Plan Was at All Times an Eligible IAP.

■ 29 U.S.C. § 1107(d)(3)(A) defines an "eligible individual account plan" as

an individual account plan that is (i) a profit-sharing, stock bonus, thrift, or savings plan; (ii) an employee stock ownership plan; or (iii) a money purchase plan which was in existence on September 2, 1974, and which on such date invested primarily in qualifying employer securities.

An "employer security" is "a security issued by an employer of employees covered by the plan, or by an affiliate of such employer." 29 U.S.C. § 1107(d)(1). In addition, to be eligible for exemption from ERISA's ten-percent limitation and diversification requirements, an individual account plan must include language "explicitly provid[ing] for the acquisition and holding of . . . qualifying employer securities." 29 U.S.C. § 1107(d)(3)(B). A "qualifying employer security" is "an employer security which is (A) stock; (B) a marketable obligation . . ., or (C) an interest in a publicly traded partnership . . . ." 29 U.S.C. § 1107(d)(5).

■ Plaintiffs contend the Plan was no longer an ESOP but was transformed into a "non-ESOP, garden variety stock bonus plan" when the Plan received Allegheny stock in exchange for its Oremet stock and ceased to hold any Oremet stock.[3] Plaintiffs assert the Oremet Plan, as a stock bonus plan only, "remained an IAP but was no longer entitled to be treated as an eligible IAP" because the Plan did not "explicitly provide for the acquisition and holding of qualifying employer securities" as required under 29 U.S.C. § 1107(d)(3)(B). According to Plaintiffs, the Plan explicitly provides only for holding Oremet stock rather than Allegheny stock.

The Plan, however, provides "[a]ll Trust Assets held under the Plan and Trust will be administered, distributed and otherwise governed by the provisions of this Plan and the related Trust Agreement." The Trust Agreement, in turn, explicitly provides "up to 100% of the assets of the Trust Fund may be invested in Company Stock" and defines "Company Stock" to include stock of an affiliate of Oremet. This is the language required by § 1107(d)(3)(B). *See* Trust Agreement, Section 4(B)(i), Ex. E, at 7, Pls.' First Am. Compl. Plaintiffs, nonetheless, assert the explicit provision required by § 1107(d)(3)(B) must be set forth in the Plan itself and not in other Plan documents such as the Trust Agreement.

To support their argument, Plaintiffs cite a Congressional Conference Report that refers to "the plan." In the Conference Report, however, Congress merely repeats statutory language and does not identify or limit which documents may constitute a plan. The Conference Report, therefore, does not require the Court to consider only the Plan itself and to ignore other supporting documents.

In addition, the Ninth Circuit has held an ERISA plan may incorporate provisions from a trust agreement, the plan may consist of more than one document, and sever-

---

**3.** The May 1996 Plan Amendments provide that "at such time as the majority of Plan assets are not invested primarily in Oremet Common Stock (the 'Transformation Date'), the first two paragraphs of [Section 1 of the Plan Agreement] shall no longer apply. On and after the Transformation Date, the Plan is a stock bonus plan . . . ." Thus, when the Plan's Oremet stock was exchanged for Allegheny stock at the time of the merger, the Plan became a stock bonus plan.

al documents collectively may comprise the governing plan instruments. *Horn v. Berdon, Inc.*, 938 F.2d 125, 127 (9th Cir.1991). *See also Schuck v. Gilmore Steel*, 784 F.2d 947, 951 (9th Cir.1986). In *Schuck v. Gilmore Steel Corp.*, the defendant company, the sponsor and fiduciary of a pension plan, terminated the plan and directed the surplus plan assets to revert to the company instead of being distributed to the participants in the plan. 784 F.2d at 951. Although ERISA generally prohibits distribution of surplus plan assets to the sponsoring company, the statute allows such a distribution in certain circumstances if "the plan provides for such a distribution." 29 U.S.C. § 1344(d)(1)(C). The governing plan documents in *Schuck* were a Pension Agreement and a Trust Agreement. Only the Trust Agreement provided for a distribution to the company. *Id.* The *Schuck* plaintiffs made the same argument Plaintiffs make here and contended "the Pension Agreement, alone, constitutes 'the plan' for purposes of section 1344(d)(1)(C)." *Id.* at 951. The Ninth Circuit rejected that argument because the agreement at issue "incorporate[d] whatever trust provisions the company decided to establish from time to time." *Id.* The Ninth Circuit reasoned the trust provisions, therefore, were part of the plan. Accordingly, the court held the plan provided "for distribution of residual assets as required by section 1344(d)(1)(C)." *Id.*

This Court finds no basis to conclude the phrase "the plan" as used in § 1107(d)(3)(B) means something different than the same language used in the ERISA provision at issue in *Schuck.* The Ninth Circuit, moreover, also has held an ERISA plan can consist of several documents, and "there is no requirement that documents claimed to collectively form the employee benefit plan be formally labelled as such." *Horn*, 938 F.2d at 127. In light of *Horn* and *Schuck*, this Court finds the Oremet Plan includes the Trust Agreement and its terms must be taken into consideration in determining whether the Plan is an eligible IAP.

When the Court considers the Plan and Trust Agreement together, the Court concludes the Plan satisfies the requirements for an eligible IAP because it explicitly provides the Plan is either an ESOP or a stock bonus plan and the Plan may acquire and hold qualifying employer securities. Allegheny stock is a qualifying employer security under the definition in the Trust Agreement and under the definition in ERISA. The Court finds the Oremet Plan, therefore, continued to be an eligible IAP after the merger.

As an eligible IAP, the Oremet Plan was at all times exempt from ERISA's diversification requirements and the ten-percent limitation. The Court concludes, therefore, Plaintiffs' claims of breach of fiduciary duty insofar as they are based on violation of these provisions must be dismissed.

### III. ERISA's Prudence Requirement.

■■■ The prudence requirement of ERISA requires a fiduciary to act "with the care, skill, prudence, and diligence under circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Fiduciaries of eligible IAPs, however, are exempt from this requirement to the extent it requires diversification. 29 U.S.C. § 1107(1)(B).

Even if the Oremet Plan was an eligible IAP after the merger, Plaintiffs nonetheless argue they have stated a claim against Defendants for failure to exercise their discretion to sell the Allegheny stock. Plaintiffs assert the "prudence requirement" of ERISA applies to an eligible IAP, and Defendants violated that requirement by not selling the Allegheny stock

post-merger to capture the premium paid by Allegheny. Plaintiffs further contend Defendants violated the prudence requirement by failing to investigate whether to continue to hold the stock as the price fell.

In addition, Plaintiffs argue Defendants had a duty to sell the company stock if that was the prudent alternative in spite of the Plan's express requirement that it retain 15% of participants' funds in company stock. A similar theory was advanced by the plaintiffs in *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir.1995). In *Kuper*, the plaintiffs filed ERISA breach of fiduciary duty claims against ESOP trustees and administrators. Plaintiffs were employees of the Emery Division of Quantum Chemical Corp and participants in the company's ESOP. In 1989, Quantum agreed to sell its Emery Division to Henkel Corp. Henkel agreed to employ existing Emery employees under comparable terms and to accept the trust-to-trust transfer of the ESOP assets of those employees who continued employment with Henkel after the sale. Although the sale was effective April 17, 1989, the trust-to-trust transfer of ESOP assets was not completed until 18 months later. During this 18–month period, the value of Quantum stock declined from more than $50 per share to approximately $10 per share. Plaintiffs asserted Quantum's acknowledged failure to consider diversifying or liquidating the ESOP constituted a breach of fiduciary duty.

Defendants in *Kuper* argued the terms of the ESOP did not give them discretion to diversify or to liquidate the ESOP funds. The Sixth Circuit discussed the duties of ERISA fiduciaries in general and the exemptions from those duties for ESOP fiduciaries. Fiduciary duties under ERISA, the court noted, have the following three components: 1) the duty of loyalty, which requires the fiduciary to make all decisions regarding an ERISA plan "with an eye single to the interests of the partici-

pants and beneficiaries," *id.* at 1458 (internal quotation and citations omitted); 2) the "prudent man" obligation, which requires the fiduciary to act as a prudent person would act in a similar situation; and 3) the exclusive purpose obligation, which requires the fiduciary to act for the exclusive purpose of providing benefits to plan beneficiaries. *Id.* (citations omitted).

The Sixth Circuit then noted an ESOP fiduciary is exempt from the duty to diversify investments and cannot be held liable for failing to diversify investments even if diversification would be prudent under the terms of a non-ESOP plan. These statutory exemptions, however, do not relieve a fiduciary from the general fiduciary responsibilities listed above. *Id.* (citing *Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir.1992)). "Thus, ESOP fiduciaries must, then, wear two hats, and are expected to administer ESOP investments consistent with the provisions of both a specific employee benefits plan and ERISA .... These competing concerns make it more difficult to delineate the responsibilities of ESOP trustees." *Kuper*, 66 F.3d at 1458 (internal quotations and citation omitted).

The Sixth Circuit ultimately balanced these competing concerns when it held an ESOP fiduciary's decision to continue investing in employer securities is reviewed for abuse of discretion.

[A] proper balance between the purpose of ERISA and the nature of ESOPs requires that we review an ESOP fiduciary's decision to invest in employer securities for an abuse of discretion. In this regard, we will presume that a fiduciary's decision to remain invested in employer securities was reasonable. A plaintiff may rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision.

*Kuper,* 66 F.3d at 1459. The *Kuper* court then examined the claim that defendants breached their fiduciary duty by failing to investigate and to consider diversifying or liquidating the ESOP in light of defendants' admitted knowledge of Quantum's financial woes. Although the court found a failure to investigate the merits of investment decisions may constitute a breach of fiduciary duties, the court also noted

> a fiduciary's failure to investigate an investment decision *alone* is not sufficient to show that the decision was not reasonable. Instead, to show that an investment decision breached a fiduciary's duty to act reasonably in an effort to hold the fiduciary liable for a loss attributable to this investment decision, a plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan. . . . In order to establish this causal link, a plaintiff must demonstrate that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.

*Kuper,* 66 F.3d at 1459 (emphasis in original).

An ESOP fiduciary's duty to diversify investments also was examined by the Third Circuit in *Moench v. Robertson,* 62 F.3d 553 (3d Cir.1995). The Third Circuit concluded an ESOP fiduciary is entitled to a presumption that it acted consistently with ERISA by investing in employer stock, and a plaintiff may overcome that presumption only by showing the fiduciary abused its discretion.

Although both *Kuper* and *Moench* note an ESOP fiduciary may be liable for failure to investigate the merits of holding employer stock, both cases recognize such a claim is a narrow exception to the general rule. In *Kuper,* the fact the ESOP fiduciaries continued to hold employer stock in light of decreasing stock prices did not constitute a violation of ERISA's prudence requirement. 66 F.3d at 1460. On the other hand, when a "precipitous decline" in the employer stock price was combined with evidence that the ESOP fiduciaries knew the sponsoring company was being seriously mismanaged and facing an impending collapse, the court in *Moench* held ERISA's prudence requirement could have required the sale of the employer's securities even though Plan documents provided for the holding of those securities. 62 F.3d at 572.

This Court finds persuasive the conclusions of the Third and Sixth Circuits that an ESOP fiduciary is entitled to a presumption that its decision to remain invested in employer securities was reasonable. To state a claim, therefore, Plaintiffs must plead facts that, if true, would establish Defendants abused their discretion by continuing to hold Allegheny stock after the merger.

Plaintiffs assert the presumption in favor of holding employer securities applies only to ESOPs and not to stock bonus plans. Plaintiffs, however, have presented no authority or principled reason for treating them differently. Both ESOPS and stock bonus plans are forms of eligible IAPs and are treated the same for the purpose of fiduciary duty analysis. *See Foltz v. U.S. News & World Report, Inc.,* 865 F.2d 364, 373–74 (D.C.Cir.1989) (stock bonus plan). *See also Moench,* 62 F.3d at 568–70 (ESOP). In addition, Plaintiffs do not allege anything more than stock price fluctuations or a decline in value of the employer's stock.

Plaintiffs also have not alleged the type of unusual circumstances that would give rise to an exception to the general rule that an ESOP fiduciary's decision to hold employer stock is consistent with ERISA's prudence requirement. Plaintiffs, in fact, establish the contrary. Plaintiffs attached

to their First Amended Complaint a series of published accounts of Allegheny's earnings and financial fundamentals during the relevant period, all of which show Allegheny was far from an impending collapse of the type involved in *Moench* and was, in fact, profitable and paying substantial dividends throughout that period. *See* Ex. I at 5, 6, 10, 14, Pls.' First Am. Compl.

Plaintiffs also allege "the significant decline in the trading price of Allegheny Technologies stock created dire circumstances under which a prudent fiduciary acting solely and exclusively for the best interest of participants would certainly have investigated all available investment options and thereafter exercised its fiduciary responsibility ... to sell the Plan's block of Allegheny Technologies stock and minimize or reduce the loss sustained by Plan participants."

The financial information attached to Plaintiffs' First Amended Complaint as Exhibit I, however, reveals Allegheny was at all times a viable concern that continued to pay dividends to investors even though Allegheny did not meet analysts' expectations. Various economic factors affected its stock prices between 1998 and 2000, including depressed stainless steel prices and weaker demand for its products in the aerospace and energy industries. The attachments to Plaintiffs' First Amended Complaint show Allegheny was not in such "dire circumstances" that Defendants' decision to hold Allegheny stock in compliance with the Plan's requirement could give rise to a claim for breach of fiduciary duty. The attachments to Plaintiffs' Complaint, therefore, refute Plaintiffs' allegation and the Court need not accept it as true. *See Amfac Mortgage*, 583 F.2d at 429.

Accordingly, the Court finds Plaintiffs cannot state a claim against Defendants for violation of ERISA's prudence requirement based on the facts alleged in the First Amended Complaint and the documents attached to it.

## IV. ERISA's Exclusive Purpose Requirement.

■ ERISA's exclusive purpose requirement mandates plans be administered "for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

Plaintiffs allege the Oremet Defendants violated ERISA's exclusive purpose requirement either by (1) deferring to the Union's judgment regarding the propriety of selling Plan assets pursuant to the Side Agreement or by (2) failing to "make a scrupulous independent determination that continued investment in employer securities was prudent or in the best interests of participants." Plaintiffs further allege Key Trust and the Union are liable as co-fiduciaries because they participated in, permitted, or failed to remedy the Oremet Defendants' breach.

Defendants assert this claim is derivative of Plaintiffs' claims that Defendants violated the prudence and diversification requirements and fails for the same reasons as set forth earlier. In their response to Defendants' Motions, Plaintiffs fail to address Defendants' assertion that this claim is derivative.

As noted, the Court has concluded Plaintiffs cannot state a claim against Defendants for breach of the diversification requirement or the prudence requirement. Plaintiffs do not dispute Defendants followed the explicit terms of the Plan documents when they retained 15% of participants' accounts in Allegheny stock. ERISA requires fiduciaries to comply with the plan as written unless it is inconsistent with ERISA. Plaintiffs have not established the Oremet Plan's requirement that

the fund hold 15% of assets in employer stock is inconsistent with ERISA.

■ "ERISA does no more than protect the benefits which are due to an employee under a plan." *Bennett v. Conrail Matched Savings Plan,* 168 F.3d 671, 677 (3d Cir.1999). ERISA does not create a duty to maximize pecuniary benefits to plan participants. *Collins v. Pension and Ins. Comm. of So. Cal. Rock Products,* 144 F.3d 1279, 1282 (9th Cir.1998). Defendants adhered to the Oremet Plans terms and, therefore, provided Plaintiffs with the benefits due. The Court concludes, therefore, Plaintiffs cannot state a claim for violation of the exclusive purpose requirement on the facts alleged in the First Amended Complaint.

## V. ERISA's Prohibited Transaction Rule

■ Finally, Plaintiffs allege Defendants violated 29 U.S.C. § 1106 by engaging in a prohibited transaction and dealing with plan assets for the benefit of a party in interest. Defendants assert these claims must be dismissed because Plaintiffs have failed to identify a transaction to which the § 1106 applies.[4]

29 U.S.C. § 1106(a)(1) provides:

A fiduciary with respect to the plan shall not cause the plan to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

ERISA also provides a plan fiduciary shall not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

■ Section 1106 "prohibits fiduciaries from involving the plan and its assets in certain kinds of business deals.... Congress enacted [§ 1106] 'to bar categorically a transaction that [is] likely to injure the pension plan.'" *Lockheed v. Spink,* 517 U.S. 882, 888, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996)(quoting *Commissioner v. Keystone Consol. Indus., Inc.,* 508 U.S. 152, 160, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993)). The prohibited transaction rule comes into play only when a fiduciary causes the Plan to engage in a transaction with a party in interest or when there is a transaction between the Plan and a fiduciary. 29 U.S.C. § 1106(a) and (b). The Supreme Court described the type of transactions enumerated in § 1106 in *Lockheed* as follows:

These are commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length. What the 'transactions' identified in § [1106(a)] thus have in common is that they generally involve uses of

---

4. Because the Court agrees with Defendants' initial premise, the Court need not reach the Union's alternative argument that it cannot be held liable under § 1106 because it never acted as a fiduciary.

plan assets that are potentially harmful to the plan.

517 U.S. at 893, 116 S.Ct. 1783.

Defendants assert Plaintiffs have failed to state a claim for violation of the prohibited transaction rule because they have failed to identify any transaction that falls within § 1106(a)(1) or (b) in spite the Court's specific instructions to do so at the hearing on December 20, 2001. Plaintiffs now admit their claim is not based on a transaction of the sort enumerated in § 1106, but Plaintiffs nonetheless contend a specific transaction is not required to state a claim for violation of § 1106. Plaintiffs rely on *Sandoval v. Simmons,* 622 F.Supp. 1174 (N.D.Ill.1985) for this proposition.

In *Sandoval,* the court found defendant fiduciaries liable for engaging in a prohibited transaction because defendants declined to tender shares in response to a specific, identifiable tender offer. The court concluded the defendant fiduciaries declined the offer so as to benefit a party in interest to the plan. *Sandoval,* therefore, stands for the proposition that when a specific transaction between a third party and a plan fund is proposed to a fund fiduciary and the fiduciary declines to enter into the transaction for self-interested reasons, that decision can trigger liability under § 1106. *Sandoval* does not support Plaintiffs' premise that Defendants can be liable even when Plaintiffs fail to identify any transaction that falls within § 1106.

At the hearing on Defendants' current Motions on June 7, 2002, Plaintiffs identified Defendants' decision not to sell the Allegheny stock as falling within § 1106(a)(1)(D) because it constituted a use of plan assets "by or for the benefit of, a party in interest." The Union, Plaintiffs allege, acted as a *de facto* fiduciary and violated § 1106 by causing Defendants not to investigate the merit of retaining the Allegheny stock and causing Defendants

not to sell the Allegheny stock after the merger so the Union could benefit by maintaining positions on the Board. Plaintiffs allege all Defendants are liable as co-fiduciaries for this violation.

The Court, however, finds Defendants' decision to continue to hold 15% of Plan assets in employer stock was in full compliance with the explicit language of the Plan. The Court concludes, therefore, Plaintiffs cannot state a claim for violation of § 1106 based on Defendants' decision to adhere to the Plan's requirements.

### *CONCLUSION*

For the above reasons, Defendants' Motions to Dismiss (# 69, # 72, # 74) are **GRANTED with prejudice** and this action is **DISMISSED**.

IT IS SO ORDERED.