**In re DUKE ENERGY ERISA LITIGATION**

**This Document Relates To: All Actions**

**No. 3:02CV291–MU.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

June 23, 2003.

Geraldine Sumter, Ferguson, Stein, Chambers, Adkins, Gresham & Sumter, Charlotte, NC, Jules Brody, Howard T Longman, Edwin J. Mills, Stull, Stull & Brody, New York, NY, Lynn Lincoln Sarko, Erin M. Riley, Derek W Loeser, Keller Rohrback, LLP, Seattle, WA, Gary Gotto, Laurie Ashton, Dalton, Gotto, Samson & Kilgard, Ron Kilgard, Gary A. Gotto, Keller Rohrback, P.L.C., Phoenix, AZ, for Jim Matthews, plaintiff.

John R. Wester, David C. Wright, III, Stephen Montgomery Cox, Robinson, Bradshaw & Hinson, P. A., Charlotte, NC, Howard Schiffman, James M. Wines, Dickstein Shapiro Morin & Oshinsky LLP, Washington, DC, for Duke Energy Corporation, Charlotte Wayland, G Alex Bernhardt, Sr, Jeffrey L. Boyer, Robert J. Brown, William A Coley, William T Esrey, Anna Maynard Gray, Dennis R. Hendrix, Harold S Hook, George Dean Johnson, Max Lennon, Leo E Linbeck, Jr, James G Martin, Richard J. Osborne, Richard B Priory, James T Rhodes, John Does 1–30, Richard Roes 1–30, defendants.

## ORDER

MULLEN, Chief Judge.

This matter is before the court upon Defendants' Motion to Dismiss Plaintiffs' class action Complaint.[1] For the reasons stated herein, the court will grant Defendants' motion.

---

**1.** Whenever the court makes reference to the "Complaint" it is referring to the Consolidated Class Action ERISA Complaint filed October 3, 2002.

## BACKGROUND

### A. Summary of the Lawsuit

In these two consolidated actions brought pursuant to the Employee Retirement Income Security Act ("ERISA"), Plaintiffs, a current and a former participant in the Duke Energy Retirement Savings Plan (the "Plan") have alleged that Defendants Duke Energy Corporation ("Duke Energy"), its former controller, each member of its board of directors and Policy Committee, and the members of the Plan's Benefit and Investment Committees are liable to a class of the Plan's participants and beneficiaries who suffered a loss as a result of the investment or holding of any portion of their Plan balances in Duke Energy common stock from January 1, 1999 to the present (the "Class Period"). Plaintiffs' Complaint alleges that Defendants, who all acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)), are liable for breaching their fiduciary duties of prudence, care, and loyalty under ERISA by, *inter alia*, (1) failing to disclose complete and accurate information concerning the Plan and its investments to the participants in the Plan; (2) failing to monitor Duke Energy stock and failing to ensure that it was a prudent investment for the Plan; (3) failing to avoid conflicts of interest; and (4) failing, among other things, to monitor the fiduciaries who "allegedly were managing this Plan but who were in fact grossly derelict in their duties." (Compl.¶ 2).

Plaintiffs' breach of fiduciary duty claims essentially fall under two different theories. The first theory (the "misrepresentation" claim) rests upon Plaintiffs' allegations that Defendants' direct and indirect communications with Plan partici-

pants included material misrepresentations and omissions which caused Plan participants to continue to purchase, hold, and maintain investments in Duke Energy stock in the Plan. Specifically, the Complaint alleges that "[b]eginning on or around January 1, 1999, Duke Energy systematically misrepresented its financial results through accounting improprieties and/or through concealing the practice of manipulation of revenue, by engaging in 89 'round trip' trades, which involved the simultaneous buying and trading of power in the same price and same amount and provided no economic benefit for the Company." (Compl.¶ 3). Plaintiffs' second theory (the "prudence" claim) alleges that by January 1, 1999, Defendants should have concluded that Duke Energy common stock was "plainly an unsuitable investment option for the Plan because it was unduly risky and trading at an inflated price." (Compl.¶ 112). Accordingly, Plaintiffs allege, Defendants should have prohibited Duke Energy from matching participants' contributions to the Plan in Duke Energy stock and should have eliminated Duke Energy common stock as an investment option under the Plan.

## B. Summary of Duke Energy's Business and the Plan

Defendant Duke Energy is in the business of providing energy and energy services to global markets, and as of December 31, 2001, owned approximately $48.4 billion in assets. During the year 2001, Duke Energy reported earnings before interest and taxes of $4.3 billion with $60 billion in revenue.[2]

▆ Duke Energy established the Plan effective January 1, 1999 as an employee stock ownership plan ("ESOP") "designed to invest primarily in employer securities." Plan § 1.02; § 9.01.[3] The Plan's participants include substantially all 24,000 employees of Duke Energy and its affiliated companies. Plan § 3.01. Contributions to the Plan are made in several different ways: (1) a "before tax" deferral equal to between 1% and 25% of the employee's annual salary, Plan § 4.01; (2) "after tax" contributions an employee elects, Plan § 4.02; and (3) "matching contributions" made by Duke Energy, Plan § 4.03. The Plan provides that Duke Energy will match an employee's "before tax" deferral 100%, up to 6% of the employee's eligible earnings. *Id.* The matching contributions must be invested in the Duke Energy Common Stock Fund. *Id.* At "any time thereafter," however, the employee may elect to sell units in this fund and purchase another of the Plan's investment options. Plan § 5.04. As of January 1, 1999, seven investment funds were available for participants, and in January 2002, the Plan added several additional investment funds. As of December 31, 2001, approximately 71% of the Plan's assets were invested in Duke Energy stock. (Compl.¶ 57). The Plan is "an individual account plan." ERISA § 3(34); 29 U.S.C. § 1002(34); Plan § 5.01. Pursuant to § 404(c) of ERISA, the Plan gives participants the right to direct the investments of their ESOP accounts and makes participants responsible for those investment decisions. Plan § 1.04; § 5.03(a)(1).

## C. Procedural History

The Complaint alleges that:

Throughout the Class Period, Defendants issued numerous statements and

---

**2.** These figures are reported in Duke Energy's 2001 10–K.

**3.** When ruling on a motion to dismiss, the court may properly consider the Plan document in its entirety. *Hull v. Policy Management Systems Corp.*, 2001 WL 1836286, *1, 2001 U.S. Dist. Lexis 22343, *3 (D.S.C.2001).

filed quarterly and annual reports with the SEC which described the Company's increasing revenues and financial performance. The SEC filings, which were incorporated by reference into the Form S–8 Registration Statements filed with the SEC pertaining to stock issued under the Plan and also incorporated by reference into the Duke Energy Retirement Savings Plan Summary Plan Description ("SPD") made available to Plan participants, included material misrepresentations and omissions with respect to the Company's financial results and prospects. These misrepresentations and omissions included, without limitation, the improper recognition of revenue from 89 "round trip" energy trades, and the failure to identify the Company's lack of necessary internal controls to monitor adequately the trading of its power.

(Compl.¶ 69). On May 17, 2002, Duke Energy issued a press release to investors, including employee investors, announcing that it had "analyzed its trades from 1999 through 2001 to identify those trades which may have some of the characteristics of sell/buy-back trades," and "[i]dentified trades accounted for less than 1 percent of the company's trading and marketing revenues."[4] On August 1, 2002, Duke Energy issued a press release announcing that it had submitted its final response to a May 31, 2002 informal request by the SEC for information about "round trip" energy trades. The response reported that Duke Energy had identified 89 "round trip" trades based upon a re-

view of all trading transactions between January 1, 1999 and June 30, 2002. The press release reported that the revenues from the reported transactions "were recorded during 2001 and the first two quarters of 2002," "totaled approximately $217 million," and "represent less than one-third of 1 percent of the company's revenues from electricity and gas marketing activity in that period." Following the May 17 press release, Duke Energy common stock declined in price from $34.70 per share to $20.00 per share at the time of the filing of the Complaint.

## DISCUSSION

### A. Motion to Dismiss Standard

In considering a motion to dismiss, the court must view the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded allegations. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir.1994). Dismissal is proper only if it appears "beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. "Misrepresentation" Claim

In support of their Motion to Dismiss, Defendants raise five independent arguments as to why Plaintiffs' misrepresentation claim fails to survive under Rule 12(b)(6) of the Federal Rules of Civil Procedure. While the court will devote its analysis to the materiality argument, the court notes that each of the other four

---

**4.** Plaintiffs' reliance upon this press release in their Complaint entitles this court to consider the document in its entirety when ruling on a motion to dismiss. *See generally In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 883 (W.D.N.C.2001) (citing cases and noting that "in deciding a Rule 12(b)(6) motion, the court will consider the facts stated in the complaint and the documents attached to the

complaint ... [C]ourts will also 'examine the other information that was publicly available to reasonable investors at the time the defendant made statements plaintiffs alleged were fraudulent,' including documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which plaintiff's allegations necessarily rely.").

independent arguments for dismissal appear to be equally availing.

 Defendants argue that Plaintiffs' "misrepresentation" claim must fail because the alleged misrepresentations are not material as a matter of law. To state a claim for breach of fiduciary duty arising from a misrepresentation, the plaintiff must establish that the misrepresentation is "material." *See generally, James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir.2002); *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir.2001); *Bunnion v. Consol. Rail Corp.*, 108 F.Supp.2d 403, 415 (E.D.Pa.1999) ("In order to make out an ERISA claim for breach of fiduciary duty under § 404(a), plaintiff must be able to establish that any misrepresentation was material."), *aff'd*, 230 F.3d 1348 (3d Cir.2000); *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 669 (2d Cir.1994). In the ERISA investment context, a misrepresentation is material only if "there [is] a substantial likelihood that it would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in" a particular investment option. *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 442 (3d Cir.1996). This standard mirrors that used by the courts in analyzing securities fraud cases. *See Gasner v. Bd. of Supervisors of the County of Dinwiddie, Virginia*, 103 F.3d 351, 356 (4th Cir.1996) ("A misrepresented or omitted fact is material if there is a substantial likelihood that a reasonable investor would have been caused by disclosure of the truthful fact to change his decision to purchase the security.").

The gravamen of Plaintiffs' Complaint is Duke Energy's improper recognition of $217 million in revenue from 89 "round trip" energy trades. Revenues for the period encompassing these transactions totaled $75.6 billion. Thus, as noted above, revenues relating to the "round trip" transactions at issue amounted to less than one-third of one percent of the total revenues reported in 2001 and the first two quarters of 2002. Many courts have found misrepresentations of even greater magnitude to be immaterial as a matter of law. For example, in *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 219 (4th Cir.1994), the Fourth Circuit affirmed the dismissal of a securities fraud complaint, stating that "[e]ven if the November and December statements are read as predictions that the company would surpass the net income achieved in the fourth quarter of the previous year, the difference between the company's predicted income (approximately 1.4% of revenues, or $330,000) and its delivered income (only .9% of revenues, or $231,000) was only .5% of total revenues. This difference is hardly material." United States Magistrate Judge McKnight in *In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 895 (W.D.N.C. 2001) dismissed a complaint that alleged First Union had misstated $79 million in earnings, holding that "[a]s a matter of law, the alleged misstatement of earnings of $79 million cannot be material for a company of this size ... The alleged $79 million understatement of losses amounts to a mere 2.1 percent of operating earnings and 2.8 percent of earnings after [merger-related] charges." *See also Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.1997) (overstatement of assets by $6.8 million, or two percent, was immaterial as a matter of law); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 & n. 26 (1st Cir.1996) (upholding rejection of proposed amended complaint when alleged misrepresentation involved somewhere between 3% and 9% of quarterly revenue figures and thus was immaterial as a matter of law); *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991) (revenues 10% below projections not actionable). Based upon these authorities,

this court concludes that the misrepresentation of revenues by the inclusion of the 89 "round trip" transactions representing less than one-third of one percent of Duke Energy's revenues is immaterial as a matter of law.

■ Plaintiffs argue that materiality is a mixed question of fact and law that is properly reserved for trial. This argument ignores the numerous authorities to the contrary, including those cited above. Indeed, there is "ample authority supporting the proposition that when it is clear that a particular financial misstatement could not possibly be significant to a reasonable investor due to its small magnitude, a court may properly determine on a motion to dismiss that the misstatement was immaterial as a matter of law." *In re Newell Rubbermaid, Inc. Sec. Litig.*, 2000 WL 1705279, *8 (N.D.Ill.2000).

Plaintiffs also assert that the concept of materiality embraces a qualitative element that must be considered by the court. Even if the court were to consider qualitative factors, Plaintiffs have fallen far short of alleging any such factors, much less ones that could elevate the insignificant amount of revenue at issue herein into anything that a reasonable Plan participant would consider significant. The only allegations in the Complaint that Plaintiffs cite in support of their argument are contained in paragraphs 69, 71 and 73. These paragraphs allude to "the Company's lack of necessary internal controls to monitor the trading of its power," and the "understating of profits by as much as $100 [sic] or more" at Duke Power Company. Nowhere do Plaintiffs enumerate any specific facts supporting their barebones allegation concerning "internal controls," identify the "internal controls" to which they refer, relate these "lack of controls" to any allegedly erroneous statement made by Duke Energy in its public filings or explain why the "lack of internal controls" would be

material. Likewise, Plaintiffs nowhere explain why a $25 million settlement by Duke Energy's franchised electric subsidiary resolving an issue concerning the underreporting of profits would matter to a reasonable investor, especially since no such "underreporting" occurred at the consolidated level at which Duke Energy's finances are reported.

Plaintiffs also discuss for the first time in their brief an unpleaded theory that the inflated energy trading revenues may have been used to "mask a circumstance of profound importance for the Company, that its trading segment did not provide the engine for future growth that had previously been indicated." (Plaintiffs' opposition brief, p. 26). The court finds that such an unpleaded theory falls woefully short of transforming an immaterial misrepresentation into one that was material.

### C. "Prudence" Claim

■ Having concluded that Plaintiffs' "misrepresentation" claim is immaterial as a matter of law and therefore subject to dismissal, the court turns to Plaintiffs' "prudence" claim (Count Two). Essentially, Plaintiffs allege in this claim that Defendants breached their fiduciary duties by investing matching contributions in Duke Energy stock and by permitting Plan participants to invest in the Company's stock. Plaintiffs assert that "[b]y no later than the beginning of the Class Period, these Defendants could not have reasonably made a determination that Company stock was a suitable investment for the Plan, either for a participant's discretionary account or for the match ... because it was unduly risky and trading at an inflated price." (Compl.¶ 112).

ERISA imposes upon a fiduciary a duty of prudence, such that the fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). In drafting the ESOP provisions of ERISA, however, Congress carved out certain exceptions to the duties imposed upon fiduciaries in the case of an ESOP. *Kuper v. Iovenko,* 66 F.3d 1447, 1458 (6th Cir.1995). These ESOP exceptions were made in order to encourage the formation of ESOPs and thus promote the goal of encouraging employee ownership of employer stock. *Id.* One of these exceptions exempts an ESOP fiduciary from a duty to diversify plan investments. *Id.* Another exempts an ESOP fiduciary from ERISA's strict prohibitions against self-dealing. *Id.* These statutory exemptions, however, do not relieve an ESOP fiduciary of his general obligation to discharge his responsibilities in a prudent fashion. *Id.* Thus, an ESOP fiduciary is often in a unique position of being required to administer an ESOP plan in such a fashion as to comply with the strict standards of fiduciary responsibility imposed by ERISA and yet satisfy the demands of Congressional policies affording ESOPs favorable treatment. *See Id.* Courts have balanced these competing concerns by adopting a deferential standard of review in cases such as this one, where a fiduciary decides to continue investing in employer securities. In *Moench v. Robertson,* 62 F.3d 553 (3rd Cir.1995), the Third Circuit held that an ESOP fiduciary who invests plan assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. *Id.* at 571. The presumption may be overcome only if plaintiff establishes that the fiduciary abused its discretion. *Id.* In attempting to rebut that presumption, the plaintiff "must show that the ERISA fiduciary could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities." *Kuper,* 66 F.3d at 1459.

The Sixth Circuit adopted this standard in *Kuper,* where plaintiffs sued ESOP fiduciaries for breach of fiduciary duties where the fiduciaries admittedly failed to consider diversifying or liquidating the ESOP during a period when the employer stock dropped from $50 to $10 per share and where the fiduciaries had intimate knowledge of the company's financial woes. *Kuper,* 66 F.3d 1447. The court held that there was no causal link to the damage alleged because "an adequate investigation would [not] have revealed to a reasonable fiduciary that the investment [in employer stock] . . . was improvident." *Id.* at 1460.

In *Wright v. Oregon Metallurgical Corp.,* 222 F.Supp.2d 1224 (D.Or.2002), the court dismissed with prejudice a complaint that alleged ESOP plan fiduciaries breached their fiduciary duties by continuing to invest in employer stock. The court observed that *Kuper* and *Moench* recognize that a claim for breach of fiduciary duty in these circumstances is "a narrow exception to the general rule." *Id.* at 1233. Decreasing stock prices, such as the 80% drop in value in *Kuper,* did not meet this narrow exception, whereas a "precipitous decline" in stock price, "combined with evidence that the ESOP fiduciaries knew the sponsoring company was being seriously mismanaged and facing an impending collapse" might. *Id.* According to the *Wright* court, only the pleading of an "unusual circumstance" other than "stock price fluctuations or a decline in value of the employer's stock," can state a claim. *Id.* Applying that standard to the case before it, the court held that the employer's earnings and financial fundamentals demonstrated that it was "far from an impending collapse," that "at all times [the

employer] was a viable concern," that the company "continued to pay dividends to investors," and that "[v]arious economic factors affected its stock prices between 1998 and 2000," including depressed prices for its products and "weaker [sector] demand." *Id.* at 1234. Because the facts outlined in documents referred to in the complaint presented no "dire circumstances" facing the corporate defendant, the court dismissed the case with prejudice. *Id.*

■ The court finds these cases persuasive and therefore adopts the standard originally espoused by the *Moench* court and holds that an ESOP fiduciary is entitled to a presumption that its decision to remain invested in employer stock is a reasonable one. Plaintiffs herein argue that Defendants are not entitled to such a presumption because the Plan at issue is not an ESOP plan, but an ordinary self-directed individual account plan subject to the full measure of ERISA's stringent fiduciary duties. In support of their argument, Plaintiffs assert that the Plan allows investment in multiple funds, of which Duke Energy stock is only one, and that employees are able to transfer their investments from one fund to another at any time without any restrictions.

ERISA § 407(d)(6) defines an "employee stock ownership plan" as an individual account plan:

> (A) which is a stock bonus plan which is qualified, or a stock bonus plan and money purchase plan both of which are qualified, under section 401 of Title 26, and which is designed to invest primarily in qualifying employer securities, and
> (B) which meets such other require-

ments as the Secretary of the Treasury may prescribe by regulation.

29 U.S.C. § 1107(d)(6). The Treasury Regulations implementing this definition specify, first, that "[t]o be an ESOP, a plan must be formally designated as such in the plan document." 29 C.F.R. § 2550.407d–6(a)(2). The Plan herein certainly meets this requirement, as evidenced by its language identifying the Plan as "an employee stock ownership plan ('ESOP')" and stating that "[t]he Plan is intended to be a stock bonus plan that is designed to invest primarily in employer securities and qualify as an ESOP within the meaning of . . . section 407(d)(6) of ERISA." *See* Plan §§ 1.01—1.02. Moreover, the fact that the Plan allowed investment in other funds does not preclude it from qualifying as an ESOP. The Regulations provide that "a stock bonus plan . . . constituting an ESOP may invest part of its assets in other than qualifying employer securities." 29 C.F.R. § 2550.407d–6(b); *see also* U.S. Dept. of Labor Opinion No. 83–6A, 1983 WL 22495, *1 ("The regulations . . . do specifically permit a portion of plan assets to be invested in other than employer securities."). There is no dispute that Duke Energy stock constitutes over 70% of the Plan's assets. Thus, the court finds that the Plan is an ESOP, and the presumption of prudence applies to its fiduciaries.[5]

■ The court next turns to the question of whether Plaintiffs have alleged in the Complaint facts sufficient to rebut this presumption. As noted earlier, the Complaint states that "[b]y the beginning of the Class Period, if not before, Company stock was plainly an unsuitable investment option for the Plan because it was unduly

---

**5.** By so holding, the court is not implying that an "eligible individual account plan" ("EIAP") providing for the acquisition of employer securities cannot be treated like an ESOP with regard to exemptions from fidu-ciary requirements. The court is simply determining that the Plan at issue is an ESOP and therefore the fiduciaries' decisions must be entitled to a presumption of reasonableness.

risky and trading at an inflated price." (Compl.¶ 112). Nowhere do Plaintiffs explain why Duke Energy stock was "unduly risky." Plaintiffs do allege that after the May 17, 2002 press release regarding round-trip transactions, the stock price fell to $33.52 per share, down from a split-adjusted Class Period high of $44.97, and is currently trading at less than $20.00 per share. However, the Complaint specifically alleges that two events unrelated to the disclosure of round-trip trades contributed to the drop in stock prices, namely, Duke Energy twice cutting its earnings estimates for the remainder of 2002. (Compl.¶ 7). Moreover, Plaintiffs ignore the fact that as of August 21, 2002, over a month after Plaintiffs filed this action and some three weeks after the August 1 press release detailing the 89 round-trip transactions upon which Plaintiffs focus, Duke Energy's stock price exceeded the price at the beginning of the Class Period.[6] As of the same August 21, 2002 date, the performance of Duke's stock from January 1, 1999 (+0.46%) substantially exceeded the S & P 500 Index (–22.76%) for the same period.

As noted earlier, Plaintiffs also make vague allegations of "lack of internal controls" and some "underreporting of profits," but nowhere do Plaintiffs allege that Duke Energy was anything other than a viable, strong company with substantial assets. In fact, the materials Plaintiffs incorporate in their Complaint or upon which this court can take judicial notice demonstrate that Duke Energy is a solid, viable company, far from "impending collapse," and not in "dire circumstances." Under the circumstances, the court must hold that Plaintiffs' "prudence claim" fails as a matter of law.

6. The share price on August 21, 2002 was $27.94 as opposed to a price of $27.81 on January 1, 1999.

D. Remaining Claims (Counts Three through Six)

Counts Three through Six of the Complaint do not provide independent grounds for relief, but rather depend upon the establishment of an underlying breach of fiduciary duty cognizable under ERISA. Because neither the "misrepresentation" claim, nor the "prudence" claim properly states claims for a breach of fiduciary duty under ERISA, these remaining counts must also be dismissed.

IT IS THEREFORE ORDERED that Defendants Motion to Dismiss is hereby GRANTED, and Plaintiffs' claims are dismissed with prejudice.